In re Barbara June KISH, Debtor.

Barbara June KISH, Plaintiff,

v.

Peter VERNIERO, in his capacity as Attorney General of New Jersey, C. Richard Kamin, in his capacity as Director of the New Jersey Division of Motor Vehicles, the New Jersey Automobile Full Insurance Underwriting Association, and the New Jersey Market Transition Facility, Defendants.

Bankruptcy No. 95–36624.
Adversary No. 96–3371.

United States Bankruptcy Court,
D. New Jersey.

May 22, 1998.

---

Gail Chester, Middlesex County Legal Services Corp., Perth Amboy, NJ, for Plaintiff/Debtor.

Marc Alan Krefetz, Trenton, NJ, for Defendants.

### MEMORANDUM OPINION

STEPHEN A. STRIPP, Bankruptcy Judge.

This is the court's decision on remand from the district court and on a motion by defendants Peter Verniero, in his capacity as Attorney General of New Jersey, C. Richard Kamin, in his capacity as Director of the New Jersey Division of Motor Vehicles (the "DMV"), the New Jersey Automobile Full Insurance Underwriting Association (the "JUA"), and the New Jersey Market Transition Facility (the "MTF") (collectively the "defendants") to dismiss the complaint in this adversary proceeding pursuant to FED. R.CIV.P. 19. The plaintiff, Barbara June Kish (the "debtor"), opposes the motion. The issues are: 1) whether the JUA and MTF are entitled to Eleventh Amendment immunity, 2) whether the doctrine of *Ex parte Young* permits this court to exercise jurisdiction over defendants Verniero and Kamin, and 3) whether the DMV is an indispensable party. pursuant to FED.R.CIV.P. 19, which is incorporated by reference in FED. R.BANKR.P. 7019. The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O). The following shall constitute the court's findings of fact and conclusions of law.

### I. FINDINGS OF FACT

On September 20, 1995, the debtor filed a petition for relief under chapter 7 of title 11, United States Code (the "Bankruptcy Code" or "Code"). Between 1985 and 1987, the debtor committed three separate violations of New Jersey motor vehicle laws. As a result, the debtor's license was suspended, she was assessed a fine, and the DMV assessed motor vehicle surcharges totaling $6,000.00 pursuant to N.J.STAT.ANN. § 17:29A–35. During the pendency of the debtor's bankruptcy case, the DMV took no action to collect the surcharge debt or to determine dischargeability of the debt. On December 20, 1995, the debtor received a discharge in bankruptcy, and notification of discharge was sent to all creditors, including the DMV Office of Surcharge and Collections.

On May 22, 1996, the DMV restored the debtor's driver's license for a fee. The debtor alleges that the DMV informed her both orally and in writing that she owed nothing to the DMV. However, on May 17, 1996, five days before restoring the debtor's license, the DMV sent a letter to the debtor demanding payment of the $6,050 surcharge debt plus an unspecified amount of prepetition

interest.[1] The debtor did not receive the letter until after her licence had been restored.

On August 15, 1996, this court issued an order permitting the debtor to reopen her bankruptcy case to file an adversary proceeding to determine the dischargeability of the surcharge debt. On August 30, 1996, the debtor filed her adversary complaint against Peter Verniero, in his capacity as Attorney General of New Jersey, and C. Richard Kamin, in his capacity as Director of the DMV, the DMV, the JUA, and the MTF. Specifically, the complaint seeks:

1. a declaratory judgment that her insurance surcharges, together with associated interest and collection costs were included in her chapter 7 discharge;

2. a declaratory judgment that the actions of defendants Kamin and Verniero violated 11 U.S.C. § 524 and this court's discharge injunction by sending the debtor a letter after her discharge demanding payment of a pre-petition debt;

3. an injunction prohibiting defendants from continuing any suit or taking any further action to collect any pre-bankruptcy surcharge or associated interest and collection costs;

4. an injunction prohibiting defendant Kamin from discriminating against her as a person who has discharged debts in bankruptcy by suspending or revoking her driving privileges due to nonpayment of such surcharges or associated interest and collection costs;

5. an injunction pursuant to 42 U.S.C. § 1983 prohibiting Kamin and Verniero from enforcing N.J.STAT.ANN. § 17:29–35 against any person who has discharged or will discharge an "Insurance Surcharge Bill" in bankruptcy;

6. a declaratory judgment that N.J.STAT. ANN. § 17:29–35 conflicts with 11 U.S.C. §§ 523, 524, and 525 and is therefore invalid under the supremacy clause of the constitution;

7. a declaratory judgment that Kamin, Verniero and their employees, attorneys and agents are estopped by virtue of their inconsistent actions and the debtor's reliance thereon from collecting any pre-bankruptcy insurance surcharge or associated interest and collection costs;

8. an injunction prohibiting the defendants from collecting any pre-bankruptcy insurance surcharge or associated interest and collection costs by virtue of estoppel.

(Complaint, ¶¶ 86–95.) The defendants did not file an answer and, instead, on September 23, 1996, filed a motion seeking to dismiss the adversary complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

This court determined that the debtor's surcharge debt, net of administrative expenses, was nondischargeable under Code section 523(a)(7) and that the debtor's remaining claims were moot in light of the dischargeability ruling. On February 4, 1997, this court entered an order granting defendants' motion for summary judgment.

On February 10, 1997, the debtor filed a notice of appeal contending that this court erred "(1) by converting defendants Rule 12(b)(6) motion without providing sufficient notice to the parties; and (2) by finding that the surcharge bills at issue constitute a 'fine, penalty, or forfeiture to and for the benefit of a governmental unit.'" *Kish v. Verniero (In re Kish)*, 212 B.R. 808, 812 (D.N.J.1997) (hereinafter "*Kish II*").

On appeal, the district court *sua sponte* raised the issue of the DMV's Eleventh Amendment immunity in light of the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The district court held that Congress' purported abrogation of states' sovereign immunity pursuant to Code section 106(a) was unconstitutional. *Kish II*, 212 B.R. at 817. The district court therefore reversed this court's finding of nondischargeability to the extent it implicated the legal rights of the DMV for lack of subject matter jurisdiction. *Id.* at 818. The

---

1. The parties agree that the DMV claim has been credited with a $750 payment and now totals $5,250 in principal plus $1,050 in statutory costs.

*Kish v. Verniero (In re Kish)*, 204 B.R. 122, 124 (Bankr.D.N.J.1997) (hereinafter "*Kish I*").

district court also held that this court erred in converting defendants Rule 12(b)(6) motion to a Rule 56 motion for summary judgment without providing the parties adequate notice. *Id.*

The district court remanded the case to this court to consider whether the JUA and MTF are entitled to Eleventh Amendment immunity. The district court directed that, if this court decides that the JUA and MTF are not entitled to Eleventh Amendment immunity, this court must then consider whether dismissal of the case against the DMV requires dismissal of the case against the JUA and MTF pursuant to FED.R.CIV.P. 19. The district court further instructed that, if this court determines that the JUA and MTF are entitled to Eleventh Amendment immunity, this court must then consider whether the debtor's claims fit within the *Ex parte Young* exception.

On October 14, 1997, the defendants filed a motion to dismiss the debtor's adversary proceeding for failure to join an indispensable party pursuant to FED.R.CIV.P. 19. Therefore, the Rule 19 issue is before this court both on remand and by defendants' motion. Upon review of the directives in *Kish II,* this court directed the parties to submit briefs on the issues of whether the JUA and the MTF were arms of the state entitled to Eleventh Amendment immunity and whether the *Ex parte Young* doctrine was applicable in the instant case.

### The Defendants' Position

The defendants argue that the issue of the possible immunity of the JUA and MTF is irrelevant to the instant case and declined to brief this issue. The defendants claim that the Eleventh Amendment immunity issue is not relevant because the JUA and MTF are not creditors of the debtor. The defendants support their assertion by pointing out that the debtor listed the DMV as a creditor but not the JUA and MTF. The defendants assert that the DMV bills and collects the surcharges. The defendants therefore conclude that the debtor's surcharge debt is owed only to the DMV, not the JUA or MTF.

The defendants further argue that the *Ex parte Young* doctrine is not applicable in the instant case. They maintain that the doctrine should only be employed "to provide a review when the state refuses to provide a forum or requires the commission of a crime in order to invoke state court jurisdiction." (Suppl.Br. in Supp. of Def. Motion to Dismiss, at 4–5.) The defendants claim that *Ex parte Young* is ineffective to allow this court to exercise jurisdiction over defendants Verniero and Kamin because the debtor has not alleged that she could not be heard in state court.

The defendants set forth two primary arguments in support of their Rule 19 request for dismissal. The defendants argue that no adequate relief can be provided to the debtor without joining the DMV and that the debtor has an adequate alternate remedy against the defendants in state court.

Similar to their argument on the Eleventh Amendment issue, the defendants argue that no adequate relief can be provided to the debtor because the DMV assesses and collects motor vehicle surcharges, not the JUA or MTF. The defendants suggest that because all assessment and collection is performed by the DMV, the JUA and MTF are not actually creditors of the debtor. The defendants argue that any declaration or injunction against the JUA or MTF will not discharge the debt owed to the State of New Jersey or hinder collection action initiated by the state because it would not bind the DMV.

Second, the defendants contend that the debtor has an adequate alternate remedy against the defendants in state court. The defendants assert that the Eleventh Amendment merely prevents the debtor from forum shopping; it does not mean that the State of New Jersey is not bound by federal bankruptcy law.

### The Debtor's Position

The debtor argues that the JUA and MTF are not arms of the state entitled to Eleventh Amendment immunity. The debtor asserts that the JUA and MTF are independent entities separate from the state, which can enter into contracts, sue and be sued in their own name, and which are supported by monies appropriated from surcharge proceeds (as well as other funds) kept separately from the state General Fund. The debtor avers

that the State of New Jersey is not financially responsible for the JUA and MTF, that the JUA and MTF performed the proprietary function of providing auto insurance, and that both entities are immune from taxation. The debtor argues that these factors militate against categorizing the JUA and MTF as arms of the state.

The debtor maintains that the doctrine of *Ex parte Young* is applicable in the instant case to allow the court to exercise jurisdiction over defendants Verniero and Kamin. The debtor argues that she is bringing an action for prospective injunctive relief to prohibit the defendants from continued violations of the federal Bankruptcy Code which is the appropriate situation for application of *Ex parte Young*.

On the Rule 19 issue, the debtor claims that the DMV is neither a necessary party under Rule 19(a) nor an indispensable party pursuant to Rule 19(b). The debtor argues that the DMV is not a necessary party under Rule 19(a) because complete relief is available without joining the DMV and because the DMV's interest will not be impaired or impeded by its absence.

The debtor asserts that complete relief is available in that this court may grant an injunction against the Director of the DMV and the Attorney General under the *Ex parte Young* doctrine which would effectively prevent the DMV from collecting the surcharge debt. The debtor asserts that the DMV has no interest in the litigation to be impaired because it is merely a collection agent for the JUA and MTF. She maintains that her debt is owed to the JUA and the MTF because the surcharge proceeds are statutorily earmarked for the JUA and MTF. The debtor, therefore, avers that the outcome of the litigation will have no financial effect on the DMV. The debtor contends that the presence of the Director of the DMV and the Attorney General in the suit will protect any interest the DMV may have. Finally, the debtor argues that the DMV will not be subject to multiple or inconsistent obligations if the suit proceeds in its absence. The debtor concludes that the DMV is not a necessary party under Rule 19(a) and that it is not necessary for the court to determine whether the DMV is an indispensable party under Rule 19(b).

The debtor argues in the alternative that even if the DMV is a necessary party under Rule 19(a), it is not an indispensable party under Rule 19(b). The debtor argues that proceeding without the DMV could prejudice no one but the debtor herself. The debtor avers, however, that she will not be prejudiced because an injunction against the Director of the DMV and the Attorney General will preclude any collection efforts by the DMV. The debtor argues that judgment in the DMV's absence will be adequate because she can receive basically the same relief she sought in its presence. Finally, the debtor contends that she has no adequate remedy if her case is dismissed because there is no other court which has this court's specialized expertise with bankruptcy issues.

## II. CONCLUSIONS OF LAW

### A. History of the JUA and MTF.

"The JUA was established in 1983 by the New Jersey Automobile Full Insurance Availability Act as an unincorporated, non-profit association of automobile insurers created to provide market rate insurance to drivers who were unable to pay the high cost of automobile insurance." *Kish I*, 204 B.R. at 128 (citing N.J.Stat.Ann. § 17:30E–1 to 17:30E–24). The JUA did not achieve its goals and by 1990 had accumulated $3.3 billion of debt in unpaid claims and other losses. *State Farm Mutual Automobile Ins. Co. v. State*, 124 N.J. 32, 42, 590 A.2d 191, 196 (1991).

"During its operation, the JUA derived income from premiums and investments." *Kish I*, 204 B.R. at 128 (citing N.J.Stat.Ann. 17:30E–8a). [S]urcharges for certain motor vehicle offenses and residual market equalization charges were also imposed to subsidize JUA income. *Kish I*, 204 B.R. at 128 (citing *In re Comm'r of Ins.'s March 24, 1992 Order*, 132 N.J. 209, 213, 624 A.2d 565, 567 (1993)).

On March 12, 1990, the legislature responded to the JUA's plight by enacting the Fair Automobile Insurance Reform Act (the "Reform Act") the principal purposes of

which were to reduce insurance costs for New Jersey drivers, transfer drivers insured by the JUA to the private market, and provide a mechanism to pay off the JUA debt. N.J.STAT.ANN. §§ 17:33B–1 to 17:33B–63; *In re Kent*, 190 B.R. 196, 201 (D.N.J.Bankr. 1995); *State Farm*, 124 N.J. at 42, 590 A.2d at 196. Pursuant to the Reform Act, the JUA was prohibited from issuing policies after September 30, 1990 and an insolvency trustee was appointed to terminate it. *In re Comm'r of Insurance's Certification of Amendment*, 254 N.J.Super. at 625, 604 A.2d at 175 (citations omitted). The MTF was created by the Reform Act to effect the orderly phase out of the JUA. Assembly Appropriations Committee Statement, Assembly, No. 1–L.1990, c. 8. *See* N.J.STAT. ANN. § 17:33B–11(c)(5) (setting forth schedule for mandatory depopulation of risks insured in the JUA and MTF).

The Reform Act created a special nonlapsing fund within the General Treasury, the New Jersey Automobile Insurance Guaranty Fund (the "AIG Fund"), to be utilized for satisfying the financial obligations of the JUA. N.J.STAT.ANN. § 17:33B–5(a) & (d). Surcharges collected by the DMV pursuant to N.J.STAT.ANN. 17:29A–35,[2] monies derived from a variety of other sources specified in N.J.STAT.ANN. § 17:33B–5(b) and funds borrowed from the New Jersey Property–Liability Insurance Guaranty Association ("PLIGA") were denominated for this purpose. *Id.* at § 17:33B–5(b) & (c).

Pursuant to the Reform Act, the MTF issued insurance policies during the transition of insured drivers to the voluntary market from October 1, 1990 to September 30, 1992. N.J.STAT.ANN. § 17:33B–11(c); (Letter from Krefetz to Court of 5/5/98 ("Krefetz

Letter"), at 5.) The MTF's last policy expired on September 30, 1993. (Krefetz Letter, at 6.) Like the JUA, the MTF did not operate profitably and incurred significant liabilities. N.J.STAT.ANN. § 34:1B–21.2(c) ("In its present financial condition, it is likely that the facility would be declared financially impaired or insolvent ...."). Both the JUA and MTF remain in operation to service old claims. (Krefetz Letter, at 2.)

On June 29, 1994, the Good Driver Protection Act (the "GDPA") was enacted to pay claims against the MTF. N.J.STAT.ANN. § 34:1B–21.1–34:1B–21.15. The GDPA developed a funding plan based on three sources: a) $439 million paid by MTF member insurers pursuant to court order; b) $665 million from the sale of MTF bonds; and c) $320 million in assessments to be paid by members of PLIGA. (Krefetz Letter, at 8 (citing Senate Budget and Appropriations Comm. Statement to Senate Bill No. 1250 (June 16, 1994))). The GDPA also amended N.J.STAT.ANN. § 17:33B–5 to provide payment of MTF "current and anticipated liabilities and expenses" from the AIG Fund. N.J.STAT.ANN. § 17:33B–5(c).

The sale of bonds was authorized pursuant to N.J.STAT.ANN. § 34:1B–21.4. The Division of Motor Vehicles Surcharge Fund (the "DMV Fund") and the Market Transition Facility Revenue Fund (the "MTF Fund") were created to fund the bonds. N.J.STAT. ANN. § 34:1B–21.4, § 34:1B–21.12.

**B. The JUA Is Entitled to Eleventh Amendment Immunity, But the MTF Is Not.**

 The Eleventh Amendment provides:

> "DMV Fund") for transfer to the Market Transition Facility Revenue Fund (the "MTF Fund") as provided in N.J.STAT.ANN. § 34:1B–21.12 for the purposes of N.J.STAT.ANN. § 34:1B–21.4. *Id.* § 17:29A–35(b)(2). After certification by the Commissioner that the surcharges are no longer needed to fund the JUA or when all MTF bonds, notes and obligations incurred pursuant to N.J.STAT ANN. § 34:1B–21.4 and the costs thereof are no longer outstanding, the surcharges will be remitted to the PLIGA to repay any loans made by PLIGA to the AIG Fund. N.J.STAT.ANN. § 17:29A–35.

---

2. Under New Jersey law as it currently stands, surcharges collected by the DMV minus the lesser of 10% or the cost of collection were remitted to the JUA until September 30, 1991. *Id.* § 17:29A–35(b)(2). From October 1, 1991, the surcharges (minus collection costs) were remitted to the AIG Fund. *Id.* § 17:29A–35(b)(2). In June, 1996, the Commissioner certified that, as of March 1, 1996, there were sufficient monies in the AIG Fund to satisfy the JUA's obligations. (Krefetz Letter, at 9.) Thereafter, all surcharges collected by the DMV pursuant to N.J.STAT ANN 17:29A–35(b) are remitted by the DMV to the Division of Motor Vehicles Surcharge Fund (the

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. The Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction." *Idaho v. Coeur d'Alene Tribe of Idaho,* —— U.S. ——, ——, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997). The Eleventh Amendment bars suits for damages when the state is the real party in interest, *Blake v. Kline,* 612 F.2d 718, 721 (3d Cir.1979) (citing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945)), absent the state's consent, waiver, or abrogation of the state's immunity by Congress. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984); *Employees v. Missouri Public Health & Welfare Dep't,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1615–16, 36 L.Ed.2d 251 (1973) ("an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another State"); *Geis v. Board of Educ. of Parsippany–Troy Hills, Morris County,* 774 F.2d 575, 580 (3d Cir.1985). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (citations omitted). The Eleventh Amendment also applies to suits requesting equitable relief. *Kish II,* 212 B.R. at 814 (citing *Pennhurst,* 465 U.S. at 100–01, 104 S.Ct. at 907–09) ("the 'jurisdictional bar [of the Eleventh Amendment] applies regardless of the relief sought'"). *See also Cory v. White,* 457 U.S. 85, 90, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the state itself simply because no money judgment is sought.").

"Where a state agency or department is named as defendant, that too is considered a suit against a state which is barred by the eleventh amendment." *Geis,* 774 F.2d at 580. "While the application of the Eleventh Amendment is a question of federal law, nevertheless, the answer to the question as to whether a particular state agency is entitled to immunity from federal jurisdiction must depend on the characteristics, capacities, powers, and immunities of such agency as defined by the law of the state." 36 C.J.S. Federal Courts § 50(1). "[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability." *Christy v. Pennsylvania Turnpike Commission,* 54 F.3d 1140, 1144 (3d Cir.1995).

The Third Circuit has set forth a three-part test for determining whether a state agency is an arm or alter ego of the state for the purposes of the Eleventh Amendment. *Christy,* 54 F.3d at 1144.

The initial part of the test inquires "whether, in the event the plaintiff prevails, the payment of the judgment would come from the state." *Id.* (citing *Peters v. Delaware River Port Authority,* 16 F.3d 1346, 1350 (3d Cir.1994)). "[T]his includes three considerations: whether the payment will come from the state's treasury, whether the agency has sufficient funds to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts." *Id.* The second part of the test considers "the status of the agency under state law (this includes four considerations: how the state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own name, and whether it is immune from state taxation)." *Id.* The final part of the test evaluates "what degree of autonomy the agency enjoys." *Id.*

### 1. Funding

The first prong of the test considers whether, if a plaintiff prevails, the payment of a judgment would come from the state. *Id.* Although no one element in the three-part *Christy* test is dispositive, the most

important factor is whether the judgment in question would be paid out of the state treasury. *Christy*, 54 F.3d at 1145; *Johnson v. State of New Jersey*, 869 F.Supp. 289, 297 (D.N.J.1994) ("the most significant factor is whether or not any damage award against the agency would be paid from the state coffers").

Initially, the court notes that the debtor is not asking for damages, but rather for an injunction preventing collection of her surcharge debt. The court could not locate a case which applied the *Christy* factors to a scenario where the plaintiff sought only injunctive relief. The Eleventh Amendment, however, is applicable to suits for injunctive relief as well as to suits for damages. *Kish II*, 212 B.R. at 814 (citing *Pennhurst*, 465 U.S. at 100–01, 104 S.Ct. at 907–08). The question is, moreover, not whether monetary damages are requested in this case; it is whether the state would be responsible for a judgment for monetary damages if such judgment were requested and obtained against the entity in question. The applicability of the Eleventh Amendment to state agencies focuses on the state's "financial responsibility," "legal liability for [the agency's] debts," and "responsibility for payment of judgments." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 45–46, 115 S.Ct. 394, 403, 130 L.Ed.2d 245 (1994).

### (a). Whether Payment Will Come from the State

The first part of the first prong of the *Christy* test considers whether payment of a judgment would come from the state. As noted by the Supreme Court in *Hess*, "prevention of federal court judgments that must be paid out of a State's treasury" was the "impetus" for the Eleventh Amendment. 513 U.S. at 48, 115 S.Ct. at 404–05. The Supreme Court noted that Courts of Appeals have "recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Id.*

### 1. A judgment against the JUA would be paid from the state treasury.

The Reform Act created the AIG Fund as a special nonlapsing fund within the General Treasury to be utilized for satisfying the financial obligations of the JUA. N.J.STAT. ANN. § 17:33B–5(a) & (d). Surcharges collected by the DMV pursuant to N.J.STAT. ANN. § 17:29A–35, monies derived from a variety of other sources specified in N.J.STAT. ANN. § 17:33B–5(b), and funds borrowed from PLIGA were denominated for this purpose. *Id.* at § 17:33B–5(b) & (c). The State Treasurer credits designated monies to the AIG Fund. Monies in the AIG Fund may be invested in the same manner as the General Fund. *Id.* at § 17:33B–5(a). The relevant statutes show no other source from which a claim against the JUA would be paid. Therefore, because the AIG Fund is within the general treasury, any judgment against the JUA would be paid from the state treasury.

### 2. It is unclear whether a judgment against the MTF would be paid from the state treasury.

It appears that a judgment against the MTF could be paid either from the AIG Fund or from revenue paid to the MTF from member insurers, PLIGA assessments, or bond sales.[3] Senate Budget and Appropria-

---

**3.** In its review of the applicable statutes, this court found two funds which might initially appear to be a source of payment for a claim against the MTF—the DMV Fund and the MTF Fund. The DMV Fund is a special nonlapsing fund within the Department of the Treasury. N.J.STAT.ANN. § 34:1B–21.12. The DMV Fund is comprised of monies transferred to the DMV Fund from the MTF as well as monies designated for the DMV Fund pursuant to N.J.STAT.ANN. § 17:29A–35(b)(2). *Id.* § 34:1B–21.12. Monies in the DMV Fund are managed and invested by the Division of Investment in the Department of the Treasury. *Id.*

The MTF Fund is a special non-lapsing fund within the NJEDA. N.J.STAT.ANN. § 34:1B–21.7. The MTF Fund is comprised of monies transferred to the MTF Fund by the State Treasurer upon appropriation by the legislature pursuant to N.J.STAT.ANN. § 34:1B–21.13, surcharge monies collected pursuant to N.J.STAT.ANN. § 17:29A–35(b), interest or other income derived from the investment of monies in the MTF Fund, and any other monies that may be deposited. *Id.* The MTF Fund was also funded by a $100 million transfer by the State Treasurer of money transferred to the DMV Fund from the MTF. N.J.STAT. ANN. § 34:1B–21.14. Any surcharges in excess of the amounts required to be used pursuant to any

tions Comm. Statement to Senate, No. 1250—L.1994, c. 57 (N.J. June 16, 1994) (hereinafter "Senate Statement 1250"); N.J.Stat.Ann. §§ 17:33B–5(c), 17:33B–11(d)(1), 34:1B–21.4.

The GDPA amended N.J.Stat.Ann. § 17:33B–5 to provide payment of MTF "current and anticipated liabilities and expenses" from the AIG Fund. N.J.Stat.Ann. § 17:33B–5(c). Because the AIG Fund is within the state treasury, a claim against the MTF paid from this fund would be paid from the state treasury.

The AIG Fund, however, is not the only source from which a claim against the MTF could be paid. The GDPA provides for payment of the current and anticipated liabilities of the MTF from: a) $439 million from MTF member insurers pursuant to court order; b) $665 million from the sale of MTF bonds by the New Jersey Economic Development Authority ("NJEDA"); c) $320 million in assessments to be paid by members of PLIGA. (Krefetz Letter, at 8 (citing Senate Statement 1250)); N.J.Stat.Ann. §§ 17:33B–11(d)(1), 34:1B–21.4. Despite extensive review of the relevant statutes and repeated inquiries to the parties, the record is unclear as to where these monies are held.[4] It appears, however, that they are paid directly to the MTF and used to pay claims against the MTF pursuant to the operating plan developed by the Commissioner. (Krefetz Letter, at 8); N.J.Stat.Ann. §§ 17:33B–11(c)(9) ("the commissioner shall amend the plan of operation to provide for . . . disbursement of claims payable by the facility" from its assets), 17:33B–11(d)(1) ("amounts paid by a member company to the facility . . ."). None of the aforementioned moneys other than the

AIG Fund appear to be in or from the state treasury.

In determining whether a party is entitled to Eleventh Amendment immunity, the burden of proof is on the party seeking such immunity. *Kish II*, 212 B.R. at 814 (citing *Pennhurst*, 465 U.S. at 100–01, 104 S.Ct. at 907–08). This court is obligated by the remand to determine if the JUA and MTF are entitled to Eleventh Amendment immunity. The court directed that the defendants brief this issue, but they failed to do so. The court has given the defendants adequate opportunity to argue in support of the JUA and MTF's entitlement to Eleventh Amendment immunity, and specifically requested evidence as to whether a judgment against the JUA or MTF would be paid from the state treasury. As noted, the evidence is insufficient as to the MTF.

As previously noted, it appears that a claim against the MTF could come from the AIG Fund, which is within the state treasury, or from one of the other three sources of MTF funding which are not within the state treasury. The Third Circuit has stated that "relief should not be viewed as coming from the state where an entity has the ability to pay the judgment from private funds not subject to state control." *Kovats v. Rutgers, The State University*, 822 F.2d 1303, 1308 (3d Cir.1987). The court finds that the defendants have not proven that a judgment against the MTF would be paid from the state treasury rather than from other sources.

*(b).* *Whether the JUA or MTF Could Satisfy? a Judgment Against Them.*

Although the court has limited information on the financial condition of the JUA and

---

bond resolutions authorizing the issuance of MTF bonds and notes and the NJEDA's agreement with the State Treasurer are remitted to the General Fund. *Id.*

The applicable statutes, however, limit the use of the DMV Fund and the MTF Fund to payment of principal, interest and premium on MTF bonds or notes issued pursuant to N.J.Stat.Ann. §§ 34:1B–21.8, 34:1B–21.12. Therefore, these funds would *not* be used to pay a judgment against the MTF.

**4.** The Senate statement indicates that the GDPA requires member insurers to turn over their apportioned share of the MTF deficit but does not

say to whom they are to turn the funds over. Senate Statement 1250. The statement also states that PLIGA assessments will be "redirected for the purpose of paying part of the financial obligation of the MTF deficit" but does not say to what fund or to whom the money will be paid. Finally, the statement notes that the GDPA allows the NJEDA to issue bonds and notes "to fund a portion of the MTF deficit" but does not say where or to whom the bond proceeds are paid. The statutes authorizing the aforementioned funding are equally vague on this point. *See* N.J.Stat.Ann. §§ 17:30A–8a(9) & (10), 17:33B–11(d), 34:1B–21.4.

MTF, it appears that both entities would be able to pay a judgment against them. In June of 1996, the Commissioner certified that as of March 1, 1996 there were sufficient monies in the AIG Fund to satisfy the JUA's current and anticipated obligations. Further, as noted in the previous discussion, the MTF has significant sources of funds. The defendants have indicated that since "the GDPA's funding plan for the MTF was implemented, the MTF has been paying all of its claims and expenses as they fall due," (Krefetz Letter, at 9) and "[a]fter the payment of the $160 million assessment in 1997, the MTF should be able ... to continue to meet all of its current and anticipated liabilities and expenses." (*Id.* at 10) Therefore, it appears that both the JUA and MTF would be able to satisfy a judgment against them.

### (c). Whether the State Has Immunized Itself.

1. *The state has not immunized itself from payment of the debts of the JUA.*

A review of the statutory structure of the JUA reveals that it was established as an independent entity for which the state initially had no financial responsibility. N.J.STAT. ANN. §§ 17:30E–5, 17:30E–7. However, the state subsequently created the AIG Fund within the state treasury to pay the debts of the JUA. *Id.* at § 17:33B–5(d). No other monies are available to pay the JUA's obligations. Because New Jersey has allocated state funds to be used to pay the JUA's debt, the state has not immunized itself from paying claims against the JUA.

2. *The state has partially immunized itself from payment of the debts of the MTF.*

The statutory structure of the MTF shows that the members of the MTF are responsible for the losses of the facility. *Id.* at § 17:33B–11. Settlement of a lawsuit between the Commissioner and MTF members capped the members' liability at $439 million. Senate Statement 1250. As with the JUA, however, the state has permitted the AIG Fund to be used to pay a portion of the liabilities and expenses of the MTF. *Id.* at § 17:33B–5(d). As noted, the GDPA also provides for non-state funding sources for payment of the MTF's obligations. Further,

the state has specifically disclaimed liability for the MTF bonds issued to cover MTF liabilities and expenses. N.J.STAT.ANN. § 34:1B–21.9 ("[MTF] bonds ... shall not be a debt or liability of the State or any agency or instrumentality thereof"). Therefore, it appears that New Jersey has provided one state resource for the payment of the MTF debt but has also taken steps to immunize itself from responsibility for the MTF's obligations.

### (d). Conclusion

1. *The first Christy factor weighs in favor of finding that the JUA is an arm of the state.*

The facts that a judgment against the JUA would be paid from the state treasury and that New Jersey permits state funds to be used to pay JUA liabilities and expenses favor a finding that the JUA is an arm of the state. Therefore, the first *Christy* factor favors characterizing the JUA as an arm of the state.

2. *The first Christy factor weighs against a finding that the MTF is an arm of the state.*

The MTF presents a more difficult case in that both state and non-state sources are available to the MTF and the state has taken steps to immunize itself from the MTF debt.

Where an agency receives funds from state and private sources, "a court should consider whether the state, in making the contribution, is acting in the role of the sovereign or is contributing in some other capacity." *Blake*, 612 F.2d at 724. Initially, it appears that New Jersey was acting as a sovereign in providing funding for the MTF in that the MTF's state and non-state funds were established under the GDPA in order to "safeguard the interests of the policyholders and the public" and because it was in the "public interest." N.J.STAT.ANN. § 34:1B–21.2(c) & (d).

An analysis of *Christy*, however, suggests a different conclusion. In *Christy*, the court found that the fact that four of the five funding sources available to the turnpike commission were not state-derived suggested

that the turnpike commission was not an arm of the state. 54 F.3d at 1145. The court also found that the fact that the state could control the commission's ability to obtain funds was only relevant if it indicated state ownership of the funds. *Id.* at 1145–46. Finally, the court found that the facts that the commission could satisfy a judgment against it and that the state had immunized itself from the turnpike commission's debt further weighed against granting immunity. *Id.* at 1146–48.

In the instant case three of the four sources available to pay a judgment against the MTF are not state-derived. Although the state has legislatively directed the establishment of the non-state funding sources for the MTF, no evidence has been presented that the state owns such ·funds. Further, although the state has allocated the AIG Fund as a resource for payment of MTF expenses and liabilities, the state has also taken steps to distance itself from the MTF debt in assigning non-state funds to pay MTF liabilities and disclaiming liability on MTF bonds. Finally, the court has found that the MTF will likely be able to satisfy a judgment against it. Because the facts relevant to the funding analysis in the instant case are so similar to the facts as to funding in Christy, this court finds that, like in *Christy,* this factor weighs against a finding of immunity.

### 2. Status at State Law

In evaluating the JUA and MTF's status at state law, the court's purpose is to determine whether New Jersey law treats the agencies as independent entities or as surrogates for the state. *Christy,* 54 F.3d at 1148. The court looks at how the state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own name, and whether it is immune from state taxation. *Id.* at 1144.

The JUA is an unincorporated nonprofit association comprised of all insurers licensed to transact automobile insurance in New Jersey. N.J.STAT.ANN. § 17:30E–4. It is operated by its own board of directors. *Id.* at § 17:30E–5. The legislature established the MTF as a separate organization run by the Commissioner, but whose members were private insurance companies. *Id.* at § 17:33B–11(a). The private insurance companies were to share in the profits and losses of the MTF. *Id.* Originally, an Advisory Board of six members representing various aspects of the private community also served the MTF. *Id.* at 17:33B–11(b) (repealed June 29, 1994).

The JUA and MTF can each sue and be sued in its own name. *Id.* at § 17:30E–7(b). *See, e.g., Market Transition Facility of New Jersey v. Twena,* 941 F.Supp. 462 (D.N.J.1996); *Venner v. Allstate, CSC,* 306 N.J.Super. 106, 703 A.2d 330 (App.Div.1997); *Donato v. Market Transition Facility,* 299 N.J.Super. 37, 690 A.2d 631 (App.Div.1997). Further, the JUA and MTF can each enter into contracts in its own name. N.J.STAT. ANN. § 17:30E–7(a), 17:33B–11(c). Both the JUA and MTF were able to transact automobile insurance. *Id.* at § 17:30E–4 (establishing the JUA to "transact automobile insurance in this State"); *In re Comm'r of Insurance's,* 132 N.J. at 216, 624 A.2d at 568 ("Under the Act, the MTF was to issue automobile-insurance polices for a two-year period"); *In re Comm'r of Insurance's May 10, 1991 Orders Regarding the January 17, 1991 Rate Filing by the Market Transition Facility of New Jersey,* 252 N.J.Super. 260, 267, 599 A.2d 906, 909 (App.Div.1991) ("MTF began issuing policies and charging premiums on October 1, 1990"). Also, the debtor asserts that the JUA was subject to taxation pursuant to N.J.STAT.ANN. § 54:18A–1 et seq. and the court has found nothing that indicates otherwise. N.J.STAT. ANN. § 34:1B–21.8 exempts income derived to pay MTF bonds or notes from taxation, but there is no statutory indication that the legislature exempted other sources of MTF income from taxation. Finally, in the past the Attorney General has argued that the JUA is not a state agency. *In re Comm'r of Insurance's Certification of Amendment to the New Jersey Automobile Full Ins. Underwriting Assoc. Plan of Operation,* 254 N.J.Super. 620, 628, 604 A.2d 172. 176 (1992).

The *Christy* court determined that the Pennsylvania Turnpike Commission was not a state agency for Eleventh Amendment pur-

poses. The court noted that the turnpike commission possessed some attributes associated with sovereignty such as the power of eminent domain, immunity from suit in state court, and exemption from state property taxation. *Christy*, 54 F.3d at 1148. However, the *Christy* court found that because the commission could sue, be sued and enter into contracts in its own name, these factors weighed against classifying the commission as a state agency.

The attributes of the JUA and MTF previously mentioned in this section suggest that these entities were intended to be independent of the state. In addition, the relevant statutes cited above also suggest that the state expected the JUA and MTF to operate independent of the state. As such, the status at state law of the JUA and MTF weighs against categorizing them as arms of the state.

### 3. Autonomy

The JUA and MTF were both created by statute. N.J.Stat.Ann. §§ 17:30E–4; 17:33B–11. Operationally, the JUA is governed by a nine-person board of directors comprised of five gubernatorial appointees, one appointee of the Speaker of the General Assembly, one appointee of the President of the Senate, the Director of the DMV and the Commissioner of Insurance. N.J.Stat.Ann. § 17:30E–5. The JUA's plan of operation was made subject to the approval of the Commissioner. *Id.* at § 17:30E–6. Originally, the JUA was able to enter contracts, sue and be sued in its own name, and establish operating procedures for carriers, *Id.* at § 17:30E–7; however, the state enacted legislation to depopulate the JUA and withdrew its ability to issue policies, essentially terminating its operation. *Id.* at § 17:33B–11(c)(5); *In re Comm'r of Insurance's March 24, 1992 Order Regarding the January 24, 1992 Rate Filing by the Market Transition Facility*, 256 N.J.Super. 158, 164, 606 A.2d 851, 854 (App.Div.1992) (stating that centerpiece of the Reform Act "was the abandonment of the JUA as a market mechanism"); N.J.Stat.Ann. § 17:33B–11(c)(5) (outlining procedure for the depopulation of the JUA). The JUA remains in operation simply to service old claims. (Krefetz Letter, at 2).

The MTF was originally run by both the Commissioner and the members of the MTF, but it is now under the sole control of the Commissioner. *Id.* at § 17:33B–11. The Commissioner can enter into contracts on behalf of the MTF and can modify or terminate executory service contracts of the MTF. *Id.* at § 17:33B–11(g). The Commissioner "is 'in effect, the chief executive officer of the State's largest insurance company.'" *In re Kent*, 190 B.R. at 205 (citing *In re Comm'r of Insurance's March 24, 1992 Order Regarding the January 24, 1992 Rate Filing by the Market Transition Facility*, 132 N.J. 209, 224, 624 A.2d 565 (1993)). The Commissioner is required to report to the Legislature and the Governor on the financial state of the JUA and MTF. N.J.Stat.Ann. § 17:33B–3. The MTF is required to submit a written application to the State Treasurer for disbursement of monies from the AIG Fund. *Id.* at § 17:33B–5. Proceeds from MTF bonds sales can only be used to satisfy liabilities and expenses that are certified by the Commissioner. *Id.* at § 34:1B–21.4. The MTF also is funded from some non-state sources as directed by statute. *Id.* at §§ 17:33B–11(d)(1), 34:1B–21.4; Senate Statement 1250.

The attributes of the MTF and JUA indicate that the degree of control exercised by the state over those entities is similar to the degree of state control of the turnpike commission in *Christy*. In *Christy*, the turnpike commission membership was controlled by the executive and legislative branches of the government. The *Christy* court noted, "[s]tate authority over the Commission members lends obvious support to a finding of sovereignty." 54 F.3d at 1149. Similarly, the statutorily-mandated creation and demise of the JUA and MTF, their largely governmental directorates, and the extent of control that the state exercises over them cause this factor to weigh in favor of a finding of immunity.

### 4. Weighing the Factors

In weighing the various *Christy* factors, the court focuses particularly on the most important consideration of whether a judgment against the entity would be paid out of the state treasury. *Christy*, 54 F.3d at 1145;

*Johnson,* 869 F.Supp. at 297. The importance of this factor is illustrated by the Supreme Court's statement in *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). " '[W]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.' There is no such requirement where the agency is structured ... to be self-sustaining." *Id.* at 50, 115 S.Ct. at 405 (citations omitted).

### (a). The JUA

As to the first *Christy* factor, the AIG Fund, which is part of the state treasury, is the only source of payment for a judgment against the JUA. As to the second factor, the JUA's status at state law, including its separate legal existence as an association of insurers, its ability to sue and be sued in its own name, and its ability to transact business, weigh against characterization as an arm of the state. The third factor, i.e. the degree of state control, suggests, however, that the JUA is an arm of the state. Weighing these three factors, the heavily-weighted factor of payment of any judgment from state treasury funds and the complete state control of the JUA outweigh the second factor's indicia of separate existence at state law. The court concludes that the JUA is entitled to Eleventh Amendment immunity.

### (b). The MTF

The evidence indicates that as to the first *Christy* factor, three of four sources from which a judgment against the MTF might be paid are not part of the state treasury. This factor therefore weighs against sovereign immunity for the MTF. *Kovats,* 822 F.2d at 1308. As to the second factor, the MTF can sue and be sued in its own name and was able to transact its own business. As to the third factor, the MTF appears to have little if any autonomy from the state. Because the heavily-weighted first factor and the second factor weigh against immunity, the court concludes that the MTF is not entitled to Eleventh Amendment immunity.[5]

Where an entity possesses both independent and sovereign-like attributes, the funding factor tends to tip the balance because it is the most important factor. *Christy,* 54 F.3d at 1145; *Johnson v. State of New Jersey,* 869 F.Supp. 289, 297 (D.N.J.1994) ("the most significant factor is whether or not any damage award against the agency would be paid from the state coffers"). *See, e.g., S.J. Groves & Sons Co. v. New Jersey Turnpike Auth.,* 268 F.Supp. 568, 574–79 (D.N.J.1967) (turnpike authority which had substantial fiscal and managerial autonomy and for which state had disclaimed liability was not arm of state despite facts that turnpike authority served public function, was statutorily created and dissolved, and had state appointed members); *Desantis v. Ricci,* 614 F.Supp. 415, 417–22 (D.N.J.1985) (New Jersey Sports and Exposition Authority was not entitled to Eleventh Amendment immunity despite the fact that its members were governmentally appointed, it was statutorily created, it could be statutorily dissolved, it served a public function, it was exempt from taxation, and it was immune from suit under the New Jersey Tort Claims Act because the sports authority could sue, be sued, lease property, borrow money, enter contracts and could not incur liability or indebtedness on behalf of or payable by the state); *State of New Jersey, Dep't of Environmental Protection v. Gloucester Environmental Mgmt. Services, Inc.,* 923 F.Supp. 651, 657–60 (D.N.J.1995) (holding colleges are not arms of state even though state contributed funds to their operation, they were immune from taxation and could not sue or be sued in their own right because they possessed a significant degree of independence in their governance and administration and received a strong continuous endowment from a source other than the public treasury).

---

5. The court received an untimely submission from the defendants on May 20, 1998 which contained additional information on the JUA and MTF in the form of the most recent financial statements for the JUA and MTF. While the court is not obligated to consider these statements because of their untimeliness, the court has reviewed them and they appear to support the court's conclusions.

## C. The Case Against the JUA and MTF Must Be Dismissed Because They are Not Creditors of the Debtor.

■ Although the court has determined it has jurisdiction over the MTF, it will nevertheless dismiss the instant case against the MTF because the MTF is not a creditor of the debtor. The reasoning in this section applies equally to the JUA and serves as an alternate ground for dismissal of the instant case against the JUA.

The defendants argue that the Eleventh Amendment is inapplicable in the instant case because the debtor owes no money to the JUA and MTF but only to the DMV. The defendants contend that because it is the DMV which actually collects the debt and is in fact the creditor of the debtor, any declaration or injunction against the JUA or MTF will not discharge the debt owed to the DMV and will not hinder any collection action initiated by the State of New Jersey.

The debtor contends that the DMV is merely a collection agent for the JUA and MTF. The debtor maintains that she owes no debt to the DMV either directly or indirectly. The debtor claims that the debt is owed to the JUA and MTF because the surcharge proceeds are earmarked for the JUA and MTF. The debtor maintains that the DMV is merely a collection agent for the JUA and MTF because the DMV only keeps collection costs.

The instant case is an adversary proceeding to determine the dischargeability of the debtor's surcharge debt. If the debt is owed solely to the DMV, then the JUA and MTF are not creditors of the debtor and not proper parties in this action. An action which has the sole purpose of determining the dischargeability of a debt and the consequences of discharge fails to state a claim upon which relief can be granted as against non-creditors under FED.R.CIV.PRO. 12(b)(6) and FED. R.BANKR.P. 7012. The court will therefore determine whether the debtor in fact owes a debt to the JUA or MTF the dischargeability of which must be adjudicated by this court.

Section 523 specifies certain debts that are nondischargeable. 11 U.S.C. § 523. "'[D]ebt' means liability on a claim." *Id.* at § 101(12). Section 101(5) defines a claim as a:

(A) *right to payment,* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance *if such breach gives rise to a right to payment,* whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured;

11 U.S.C. § 101(5) (emphasis added). In enacting section 101(5), "Congress sought the 'broadest possible definition of a claim,' intending that virtually all obligations to pay money be amenable to treatment in bankruptcy proceedings." *In re Adams,* 106 B.R. 811, 816 (Bankr.D.N.J.1989). As noted by *Adams,* the Third Circuit addressed the issue of when a claim arises in bankruptcy in the case of *In re M. Frenville Co., Inc.,* 744 F.2d 332, 337 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

In *Frenville,* the Third Circuit held that the threshold determination of whether a claim existed depended on if there was a "right to payment." Recognizing that the Bankruptcy Code did not define "right to payment" the Third Circuit held that "while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'"

*In re Adams,* 106 B.R. at 816 (citing *In re Frenville,* 744 F.2d at 336–37). As a result, New Jersey state law defines whether the JUA and MTF have a right to payment and, therefore, possess a claim against the debtor.

Any interest the JUA and MTF may have in the surcharge proceeds is stated in N.J.STAT.ANN. § 17:29A–35(b)(2). The relevant portion of the statute reads:

All moneys collectible under this subsection b. *shall be billed and collected by the Division of Motor Vehicles.* Of the money collected: 10%, or the actual cost of administering the collection of the surcharge,

whichever is less, shall be retained by the Division of Motor Vehicles until August 31, 1996; ... and prior to October 1, 1991, *the remainder shall be remitted to the New Jersey Full Automobile Insurance Underwriting Association* and on or after October 1, 1991 until August 21, 1996, *the remainder shall be remitted to the New Jersey Automobile Insurance Guaranty Fund* .... Commencing on September 1, 1996, or such earlier time as the Commissioner of Insurance shall certify to the State Treasurer that amounts on deposit in the New Jersey Automobile Insurance Guaranty Fund are sufficient to satisfy the current and anticipated financial obligations of the New Jersey Automobile Full Insurance Underwriting Association, *all plan surcharges collected by the Division of Motor Vehicles under this subsection b. shall be remitted to the Division of Motor Vehicles Surcharge Fund for transfer to the Market Transition Facility Revenue Fund* ... [then to] be remitted to the New Jersey Property–Liability Insurance Guaranty Association ... to be used for payment of loans made by the association to the New Jersey Automobile Insurance Guaranty Fund pursuant to section (10) of section a. of ... 17:30A–8 ...

N.J.Stat.Ann. § 17:29A–35(b)(2) (emphasis added).

When interpreting a statute, the plain language of the statute controls. *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1498 (3d Cir.1996). N.J.Stat.Ann. § 17:29A–35(b)(2) indicates that the DMV "bills and collects" the surcharges. If a party does not pay the DMV, the DMV may suspend the person's license. N.J.Stat.Ann. § 17:29A–35(b)(2). The statute directs the DMV to pay money over to the JUA and MTF but does not give the JUA or MTF the right to collect surcharges from individuals. As a result, under the statute the JUA and MTF do not have a right to payment *from the debtor* and, therefore, do not have a claim against the debtor. The DMV is the only claim holder under the statute.[6]

The debtor's argument that the DMV is merely a collection agent for the JUA and MTF is unpersuasive. An agent acts at a principal's direction. "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent," *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337, 634 A.2d 74, 79 (1993) (citing *Arcell v. Ashland Chemical Co.*, 152 N.J.Super. 471, 494–95, 378 A.2d 53 (Law Div. 1977)). "A necessary element of any agency relationship is the right of the principal to control the conduct of the agent." *Arcell*, 152 N.J.Super. at 494, 378 A.2d at 65. No evidence has been offered that the DMV acts at the JUA or MTF"s direction. Therefore, the necessary element of control is missing from the relationship between the DMV and JUA. Finally, the debtor's own complaint states that the surcharges are collected for the benefit of the JUA and MTF but does not assert that any debt is owed directly to the JUA or MTF. (Complaint ¶ 76.) The court therefore concludes that the DMV is not a collection agent for the JUA and MTF.

Because the JUA and MTF have no right to payment from the debtor, they have no claim against the debtor. 11 U.S.C. § 101(5); *In re Frenville*, 744 F.2d at 336–37; *In re Adams*, 106 B.R. at 816. Because a debt is "liability on a claim," the debtor owes no debt to the JUA and MTF. 11 U.S.C. § 101(12). Because there is no debt to the JUA and MTF, they are not creditors of the debtor and are not proper parties in the instant action, the sole purpose of which is to determine the dischargeability of the surcharges and the legal consequences of a discharge. Therefore, the case against the MTF is dismissed. This reasoning also provides an alternate ground for dismissal of the case against the JUA.

### D. The *Ex parte Young* Doctrine Permits the Court to Exercise Jurisdiction Over the Director of the DMV and the Attorney General.

As indicated by the discussion in Section B, *supra*, absent consent, waiver or

---

**6.** As the defendants point out, the debtor did not list the JUA and MTF as creditors in the sched-

ules of creditors filed with her bankruptcy petition.

abrogation of immunity, states are entitled to Eleventh Amendment immunity from suit in federal court. U.S. CONST. amend. XI.; *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907; *Employees*, 411 U.S. at 280, 93 S.Ct. at 1615–16; *Blake*, 612 F.2d at 721 (citing *Edelman*, 415 U.S. 651, 94 S.Ct. 1347; *Ford*, 323 U.S. 459, 65 S.Ct. 347). As with state agencies, suits against state officials are barred when " 'the state is the real, substantial party in interest.' " *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908 (quoting *Ford*, 323 U.S. at 464, 65 S.Ct. at 350). "Thus, '[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.' " *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908 (quoting *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963)).

The doctrine of *Ex parte Young* carves out an exception to Eleventh Amendment immunity where a suit for prospective injunctive relief is brought against state officers in their official capacity for continuing violations of federal law. *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 688, 121 L.Ed.2d 605 (1993).

> The doctrine of *Ex parte Young*, which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity. Moreover, the exception is narrow: It applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought.

*Id.* (citations omitted). This doctrine, as its nomenclature suggests, was articulated in the case of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), although its roots extend earlier in time. *See Puerto Rico Aqueduct*, 506 U.S. at 145, 113 S.Ct. at 688, 121 L.Ed.2d 605 (1993) ("Support for this narrow view of the Eleventh Amendment is drawn mainly from *Ex parte Young* "); MODERN CONSTITUTIONAL LAW, STRUCTURE AND JURISDICTION OF FEDERAL COURTS, § 48.23.[7] "[T]he Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " *Pennhurst*, 465 U.S. at 105, 104 S.Ct. at 910 (citing *Ex parte Young*, 209 U.S. at 160, 28 S.Ct. at 454). *See also Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974); *Georgia R. & Banking Co. v. Redwine*, 342 U.S. 299, 304, 72 S.Ct. 321, 324, 96 L.Ed. 335 (1952).

In *Ex parte Young*, the state of Minnesota effected a reduction in rates for passenger and freight travel by setting said rates through various legislative acts. 209 U.S. at 127–28, 28 S.Ct. at 443–44. Failure to implement the state set rates could result in imprisonment and serious fines. *Id.* at 127–29, 28 S.Ct. at 443–44. Before one set of rates was to take effect, shareholders of various railroads filed suit to enjoin the railroads from publishing or adopting the rates set by Minnesota and to enjoin various defendants, including the attorney general of Minnesota, from enforcing the legislation. *Id.* at 129, 28 S.Ct. at 444. The plaintiffs argued that enforcement of the legislation would result in deprivation of property without due process of law and equal protection of laws. *Id.* at 130, 28 S.Ct. at 444–45. The circuit court issued a temporary restraining order preventing the railroads from instituting the rates and also issued an order restraining the attorney general from taking any steps against the railroads for their failure to comply with the legislation. *Id.* at 132, 28 S.Ct. at 445. The attorney general defied the order asserting that the suit against him was barred by the Eleventh Amendment. *Id.* at 133–34, 28 S.Ct. at 445–46.

---

**7.** The doctrine articulated in *Ex parte Young* was clearly identified by the Supreme Court long before the date of that decision. In 1898, the Court had noted:

> It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of that Amendment.

MODERN CONSTITUTIONAL LAW, *supra* (citing *Smyth v. Ames*, 169 U.S. 466, 518, 18 S.Ct. 418, 423, 42 L.Ed. 819 (1898)).

The *Young* Court recognized that the Eleventh Amendment could apply both to states and to state officers. *Id.* at 150, 28 S.Ct. at 450. The *Young* Court reviewed various decisions and found they "furnish[ed] ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." *Id.* at 155–56, 28 S.Ct. at 452. The *Young* Court concluded that the suit against the attorney general to enjoin his unconstitutional act was not a suit against the state prohibited by the Eleventh Amendment. *Id.* at 167–168, 28 S.Ct. at 445–447. The court reasoned:

> The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Id.* at 159–60, 28 S.Ct. at 454.[8]

Since the *Young* decision, the Court has continued to support the vitality of the *Young* doctrine, but has applied it narrowly. *See, e.g., Idaho,* —— U.S. at —— – ——, 117 S.Ct. at 2040–43 (acknowledging application of *Young* is ordinarily appropriate in suits against state officials for prospective injunctive relief for continuing violations of federal law but refusing to apply doctrine to a suit which is functional equivalent of a quiet title action against state); *Seminole,* 517 U.S. at 73 n. 16, 72–76, 116 S.Ct. at 1131 n. 16, 1132–33 (noting existence of *Young* as remedy for a state officer's continuing violation of federal law, but refusing to apply *Young* where statute in question provides detailed remedial scheme); *Papasan v. Allain,* 478 U.S. 265, 282, 106 S.Ct. 2932, 2942–43, 92 L.Ed.2d 209 (1986) (permitting jurisdiction under *Young* where remedy would cure unequal distribution of benefits of state's school lands, even though remedy might require expenditure of state funds); *Green v. Mansour,* 474 U.S. 64, 68, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985) (noting necessity of the *Young* exception to "vindicate the federal interest in assuring the supremacy of [federal] law" but refusing to apply *Young* to allow declaratory judgment where there was no continuing violation of federal law); *Pennhurst,* 465 U.S. at 104–06, 104 S.Ct. at 910–11 (declaring the necessity of the *Young* doctrine but finding interest of promoting the supremacy of federal law was not present in a suit against state officials for violating state law); *Treasure Salvors,* 458 U.S. at 697–99, 102 S.Ct. at 3321–22 (granting jurisdiction over state officials pursuant to *Young* where arrest warrant naming state officials "sought possession of specific property" and "did not seek any attachment of state funds and would impose no burden on the state treasury"); *Quern,* 440 U.S. at 346–48, 99 S.Ct. at 1147–49 (allowing application of *Young* to require state officials to send notice apprising class action members of available administrative remedies); *Edelman v. Jordan,* 415 U.S. 651, 664–71, 94 S.Ct. 1347, 1356–60, 39 L.Ed.2d 662 (1974) (holding *Young* doctrine applies only

---

**8.** "This rationale, of course, created the 'well-recognized irony' that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment." *Pennhurst,* 465 U.S. at 104–05,

104 S.Ct. at 910–11 (citing *Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 685, 102 S.Ct. 3304, 3315, 73 L.Ed.2d 1057 (1982) (opinion of STEVENS, J.))

to suits for true prospective injunctive relief, not to equitable order granting monetary relief for past deprivation of benefits). As noted in *Papasan*, "*Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated ... in the past, as well as on cases in which the relief against the state official directly ends the violation of federal law ..." 478 U.S. at 277–78, 106 S.Ct. at 2940. However, "'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.'" *Papasan*, 478 U.S. at 278, 106 S.Ct. at 2940 (citing *Green*, 474 U.S. at 68, 106 S.Ct. at 425–26).

In the instant case, the debtor names as defendants Peter Verniero, in his capacity as Attorney General of New Jersey and C. Richard Kamin, in his capacity as Director of the DMV. The State of New Jersey and the DMV are entitled to Eleventh Amendment immunity. *Edelman*, 415 U.S. at 663, 94 S.Ct. at 1355 ("an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state") (citations omitted); *Kish II*, 212 B.R. at 817 ("the DMV ... is entitled to Eleventh Amendment immunity"). As such, if this court can exercise jurisdiction over defendants Verniero and Kamin in their official capacities, it is only pursuant to the *Ex parte Young* doctrine.

The debtor alleges that defendants Verniero and Kamin intend to continue to demand payment of surcharges and to suspend or refuse to restore licenses of the debtor and other persons who obtain a chapter 7 discharge, (Complaint ¶ 31), in violation of federal bankruptcy law. The debtor is seeking:

1. a declaratory judgment that her insurance surcharges, together with associated interest and collection costs were included in her chapter 7 discharge;

2. a declaratory judgment that the actions of defendants Kamin and Verniero violated 11 U.S.C. § 524 and this court's discharge injunction by sending the debtor a letter after her discharge demanding payment of a pre-petition debt;

3. an injunction prohibiting defendants from continuing any suit or taking any further action to collect any pre-bankruptcy surcharge or associated interest and collection costs;

4. an injunction prohibiting defendant Kamin from discriminating against her as a person who has discharged debts in bankruptcy by suspending or revoking her driving privileges due to nonpayment of such surcharges or associated interest and collection costs;

5. an injunction pursuant to 42 U.S.C. § 1983 prohibiting Kamin and Verniero from enforcing N.J.Stat.Ann. § 17:29–35 against any person who has discharged or will discharge an "Insurance Surcharge Bill" in bankruptcy;[9]

6. a declaratory judgment that N.J.Stat. Ann. § 17:29–35 conflicts with 11 U.S.C. §§ 523, 524, and 525 and is therefore invalid under the supremacy clause of the constitution;

7. a declaratory judgment that Kamin, Verniero and their employees, attorneys and agents are estopped by virtue of their inconsistent actions and the debtor's reliance thereon from collecting any pre-bankruptcy insurance surcharge or associated interest and collection costs;

8. an injunction prohibiting the defendants from collecting any pre-bankruptcy insurance surcharge or associated interest and collection costs by virtue of estoppel.

(Complaint, ¶¶ 86–95.)

As indicated by requests 3, 4, 5 and 8, the debtor is seeking an injunction to prevent Kamin and Verniero, state officials, from violating federal law in the future by attempting to collect her surcharge debt or discriminating against her by suspending or revoking her license for failing to pay the surcharge debt. This is clearly a request for prospective injunctive relief to prevent an alleged continuing violation of federal law—the classic circumstances permitting application of the *Young* doctrine. *Idaho*, — U.S. at —, 117 S.Ct. at 2040 ("An allegation of an ongoing violation of federal law where the re-

---

**9.** This court notes that the debtor has not requested that the instant suit be certified as a class action or stated any other basis for asserting the rights of third parties.

quested relief is prospective is ordinarily sufficient to invoke the *Young* fiction").

The fact that the debtor also seeks a declaratory judgment in requests 1, 2, 6 and 7 does not preclude the exercise of this court's jurisdiction pursuant to *Young*. "The *Ex parte Young* exception has been interpreted by courts to allow suits against state officials for both prospective injunctive and declaratory relief." *Balgowan v. State*, 115 F.3d 214, 217 (3d Cir.1997). In *Idaho v. Coeur d'Alene*, the Supreme Court cited *Ex parte Young* stating that the suit against Idaho "is barred by Idaho's Eleventh Amendment immunity unless it falls within the exception this Court has recognized for certain suits seeking *declaratory and injunctive relief* against state officers in their individual capacities." — U.S. at —, 117 S.Ct. at 2034 (emphasis added). *See also Green*, 474 U.S. at 73, 106 S.Ct. at 428–29 (limiting declaratory relief under the *Young* exception to instances were prospective injunctive relief to end a continuing violation of federal law was also available); *Papasan*, 478 U.S. at 266, 281–82, 106 S.Ct. at 2933–34, 2942–43 (stating suit seeking declaratory relief against state officials for continuing violation of the Equal Protection Clause was permissible under *Young* exception). As such, the debtor's requests for a declaratory judgment and prospective injunctive relief are both available under the *Young* exception.

Defendants assert that the *Young* doctrine is inapplicable in the instant case because the debtor's request is, in essence, a disguised suit for damages. Although discharge of the debtor's surcharge debt would deprive the state of that money, the instant suit is not one for retroactive damages. *Edelman v. Jordan* expounds upon the difference between permissible prospective injunctive relief and a prohibited suit for retroactive money damages.

In *Edelman*, the district court ordered state officials to release and remit Aid to the Aged, Blind and Disabled benefits that were wrongfully withheld from the date of the federal regulations in issue to the date of the preliminary injunction issued by the district court. 415 U.S. at 656, 94 S.Ct. at 1352. The state officials "contended, inter alia, that

the Eleventh Amendment barred the award of retroactive benefits" and "that the judgment of inconsistency between the federal regulations and the provisions of the Illinois Categorical Assistance Manual could be given prospective effect only." *Id.* at 657–58, 94 S.Ct. at 1353. The Seventh Circuit Court of Appeals rejected these contentions and affirmed the district court. *Id.* at 658, 94 S.Ct. at 1353. The Seventh Circuit held that the *Young* doctrine did not preclude the grant of a monetary award in the nature of equitable restitution. *Id.* at 663–64, 94 S.Ct. at 1355–56.

The Supreme Court reversed the Seventh Circuit, finding the award of benefits withheld prior to the preliminary injunction to be a retroactive award of damages. *Id.* at 668–69, 94 S.Ct. at 1358–59. The Court distinguished *Ex parte Young*, observing that *Young* authorized only prospective relief. *Id.* at 664, 94 S.Ct. at 1356. The Court stated that the prospective portion of the district court's order was acceptable but that the retroactive portion of the order was not acceptable under *Young*. *Id.*

The Supreme Court also reversed the Seventh Circuit's finding that the *Young* doctrine did not preclude the grant of a monetary award in the nature of equitable restitution. *Id.* at 666, 94 S.Ct. at 1357. The Court declared,

> [w]e do not read *Ex parte Young* or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature.

*Id.* at 666, 94 S.Ct. at 1357. The court noted that "[t]he funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself than it does the prospective injunctive relief awarded in *Ex parte Young.* " *Id.* at 665, 94 S.Ct. at 1357 (citations omitted).

■ In the instant case, if the debtor's allegations that New Jersey state law con-

flicts with federal bankruptcy law in this case are true, defendants Verniero and Kamin can be enjoined from continuing to violate federal law by attempting to collect a discharged debt and by discriminating against her for failure to pay such debt. The complaint does not request any payment. Further, as articulated in *Edelman*, it is not a requisite of the *Young* doctrine that an injunction have no effect on the treasury. *Id.* at 668, 94 S.Ct. at 1358. The court observed that in *Young* and other cases properly employing the *Young* doctrine,

> [s]tate officials, in order to shape their official conduct to the mandate of the Court's decrees would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*.

*Id.* at 668, 94 S.Ct. at 1358.

A review of recent cases in which the Court permitted the exercise of jurisdiction pursuant to the *Young* doctrine is instructive. As noted, *Edelman* was a suit to require state officers to pay disability benefits that had been withheld in the past; this was impermissible under the *Young* exception. 415 U.S. at 651, 668–69, 94 S.Ct. at 1350, 1358–59. In *Ex parte Young*, the Court upheld injunctive relief that would prevent the state from instituting suit against and collecting monetary penalties from railroads that violated a state law which was alleged to be unconstitutional. 209 U.S. at 167–68, 28 S.Ct. at 457. In *Quern v. Jordan*, the Court permitted injunctive relief requiring the state to mail a particular notice informing class action defendants of available administrative remedies. 440 U.S. at 346–48, 99 S.Ct. at 1147–49. In *Milliken v. Bradley*, the Court allowed injunctive relief that would require the state to expend funds in order to prospectively fulfill court-ordered education requirements. 438 U.S. at 288–90, 98 S.Ct. at 2747–48. Finally, in *Treasure Salvors*, the Court granted jurisdiction over state officials pursuant to *Young* where an arrest warrant naming state officials "sought possession of specific property" and "did not seek any attachment of state funds and would impose no burden on the state treasury." 458 U.S. at 697–98, 102 S.Ct. at 3321.

In the instant case, unlike *Edelman*, the debtor is not seeking money damages to rectify past violations of federal law. Instead she is seeking to prevent the officials from violating federal law in the future by ignoring the alleged discharge in bankruptcy of the surcharge debt. Although preventing collection of the surcharge debt may appear analogous to awarding the debtor damages (e.g. if the DMV had successfully collected the debt in the past in violation of the discharge), there is an important distinction between the two. The latter situation is clearly a suit for monetary damages for a past violation of federal law. The former, however, is not primarily a suit for damages but for an injunction to prevent continued violations of the federal Bankruptcy Code.

> Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant.... On the other hand, relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

*Papasan*, 478 U.S. at 278, 106 S.Ct. at 2940 (citing *Milliken*, 433 U.S. at 289–90, 97 S.Ct. at 2761–62; *Edelman*, 415 U.S. at 667–68, 94 S.Ct. at 1357–58). Furthermore, as *Edelman* acknowledges, "the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman*, 415 U.S. at 667, 94 S.Ct. at 1357.

Considering the foregoing, this court finds that the effect on the state treasury of the injunction requested by the debtor would be ancillary. Therefore, this case falls "on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side." *Quern*, 440 U.S. at 347, 99 S.Ct. at 1148–49.

The defendants also object to this court exercising jurisdiction pursuant to *Young* because they contend that *Young* should only be applied "to provide a review when the state refuses to provide a forum or requires the commission of a crime in order to invoke state court jurisdiction." (Suppl.Br. in Supp. of Def. Motion to Dismiss, at 4–5.) Although the defendants do not cite any authority supporting this argument, this court assumes the defendants are alluding to *Idaho*. In *Idaho*, Justice Kennedy stated,

> there are, in general, two instances where *Young* has been applied. The first is where there is no state forum available to vindicate federal interests, thereby placing upon Article III courts the special obligation to ensure the supremacy of federal statutory and constitutional law.... Even if there is a prompt and effective remedy in a state forum, a second instance in which *Young* may serve an important interest is when the case calls for the interpretation of federal law.

—— U.S. at ——–——, 117 S.Ct. at 2035–36 (Kennedy, J. writing for majority but joined only by Rehnquist, C.J.). First, this court notes that Justice Kennedy was joined only by Chief Justice Rehnquist in this portion of his opinion, and therefore, this statement is of limited precedential value. Further, the instant case calls for an interpretation of the Bankruptcy Code to determine whether the debtor's surcharge debt was included in her discharge, and therefore, meets one of the two instances in which Justice Kennedy indicated that *Young* was applicable. Additionally, the majority in *Idaho* specifically stated that "[a]n allegation of an on-going violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." —— U.S. at ——, 117 S.Ct. at 2040 (refusing to apply *Young* only because the suit was "the functional equivalent of a quiet title action which implicates special sovereignty interests.") Finally, in *Seminole*, the Supreme Court specifically observed that *Young* would be applicable in instances similar to this case. The Court stated,

Justice Stevens understands our opinion to prohibit federal jurisdiction over suits to enforce the bankruptcy, copyright, and antitrust laws against the States. He notes that federal jurisdiction over those statutory schemes is exclusive, and therefore concludes that there is "no remedy" for state violations of those federal statutes. That conclusion is exaggerated both in its substance and in its significance. First, Justice Stevens' statement is misleadingly overbroad. We have already seen that several avenues remain open for ensuring state compliance with federal law. *Most notably, an individual may obtain injunctive relief under Ex parte Young in order to remedy a state officer's ongoing violation of federal law.*

*Seminole,* 517 U.S. at 73 n. 16, 116 S.Ct. at 1131 n. 16 (emphasis added, citations omitted). As a result, this court rejects the defendants' contention that the *Young* exception is inapplicable to the instant case.

While this matter was under consideration after remand, Judge William F. Tuohey of the Bankruptcy Court for this district issued two opinions which addressed Eleventh Amendment issues pertaining to the discharge in chapter 13 cases of fines for motor vehicle law violations and DMV surcharges. Those cases are distinguishable from this but warrant some comment.

In *In re Perez,* 220 B.R. 216 (Bankr.D.N.J. 1998) the court held that it lacked subject matter jurisdiction to compel restoration of a chapter 13 debtor's driver's license which had been suspended for failure to pay parking tickets. In *In re Burkhardt,* 220 B.R. 837 (Bankr.D.N.J.1998) (forthcoming May, 1998) [10] the court held that it lacked subject matter jurisdiction to compel restoration of a chapter 13 debtor's driver's license which had been suspended for failure to pay various motor vehicle violations. The court held in *Perez* and *Burkhardt* that municipalities are entitled to Eleventh Amendment immunity. In so doing, the court relied on *In re Christie,* 218 B.R. 27 (Bankr.D.N.J.1998) (not to be

---

**10.** *In re Burkhardt* was filed on May 13, 1998 (Case No. 97–40459) and marked "For Publication" but was not available on computerized legal research at the time of issuance of this opinion.

confused with *Christy v. Pennsylvania Turnpike Commission,* 54 F.3d 1140 (3d Cir. 1995)). *Christie* held that the Monmouth County Division of Social Services was entitled to Eleventh Amendment immunity. This court notes, however, that the Supreme Court has held that

> The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, *but does not extend to counties and municipal corporations.*

*Mt. Healthy City Sch. District Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977) (emphasis added). *See also In re Decalcomania Mfg. Corp.,* 142 B.R. 670, 673–674 (Bankr.D.N.J.1990) (citing numerous cases holding that counties and municipalities have no Eleventh Amendment immunity and holding that the City of Camden has no such immunity).

In both *Perez* and *Burkhardt* the court also opined that pre-*Seminole* bankruptcy cases applying Code section 525, which prevents "governmental units" from discriminating against debtors solely because of failure to pay a dischargeable debt, are no longer good law. This court points out, however, the following. First of all, the definition of "governmental unit" under Code section 101(27) includes far more than states. Secondly, to the extent that a governmental unit charged with a violation of Code section 525 is a state, the states are bound by the Supremacy Clause to follow federal law. The Eleventh Amendment deals solely with the forum in which states can be compelled to appear; it does not trump the Supremacy Clause. *See Idaho,* —— U.S. at ——, 117 S.Ct. at 2037 ("It is the right *and duty* of the States, within their own judiciaries, to interpret *and to follow* the Constitution *and all laws enacted pursuant to it,* subject to a litigant's right to review in this Court in a proper case.") (emphasis added). Thirdly, where a litigant *does not name a state or an agency thereof as a defendant, but names instead state officials* in an action for declaratory and injunctive relief to terminate an ongoing violation of bankruptcy or other federal law, relief can be obtained under the *Ex*

*parte Young* doctrine. *Seminole,* 517 U.S. at 73 n. 16, 116 S.Ct. at 1132 n. 16. Whether governmental action in response to failure to pay a debt actually violates federal bankruptcy law may, however, depend upon the nature of the debt among other factors. *Compare In re Bill,* 90 B.R. 651 (Bankr.D.N.J. 1988) (suspension of a driver's license solely because of failure of a debtor to pay a DMV surcharge which was dischargeable in chapter 13 violated Bankruptcy Code section 525) and In re *Cuevas,* 205 B.R. 457 (Bankr. D.N.J.1997) (incarceration of debtor for failure to pay fines for violating motor vehicle laws was continuation of a criminal proceeding excepted from the automatic stay under Code section 362(b)(1)).

The court further notes that an action against a state official for declaratory or injunctive relief under *Ex parte Young* to terminate an ongoing violation of bankruptcy law will presumably require an adversary proceeding. FED.R.BANKR.P. 7001(7) and (9).

**E. The Rule 19 Issue Is Moot.**

On remand, the district court instructed that, if this court retained jurisdiction over the JUA and MTF, it would need to determine whether dismissal of the instant case against the DMV required dismissal of the case against the JUA and MTF pursuant to FED.R.CIV.P. 19. The defendants raised this same issue by motion. Because this court has dismissed the case against the JUA and MTF, the Rule 19 issue is moot.

**III. Conclusion**

To summarize, the court holds the following.

1. The JUA is entitled to Eleventh Amendment immunity but the MTF is not.

2. The JUA and MTF are not creditors of the debtor, however, because neither of them has a claim against the debtor. As a result, the JUA and MTF are not proper parties in the instant case. Therefore, the case is dismissed as against them.

3. Although the court has dismissed the case against the JUA and MTF, the court finds that the debtor is seeking prospective injunctive relief and declaratory relief to prevent continuing violations of federal law. As

such, this court is permitted to exercise jurisdiction over the Director of the DMV and the Attorney General under the *Ex parte Young* doctrine.

4. Finally, because the court has dismissed the case against the JUA and MTF, the defendants' Rule 19 motion is moot.

The plaintiff is to file an order within ten (10) days under D.N.J. LBR 9072(c) and is to arrange a phone conference to schedule further proceedings.