## In re TECHNOLOGIES INTERNATIONAL HOLDINGS, INC., Debtor.

## In re Advanced Technologies International, Inc., Debtor.

## In re Meridian Transport Co., Debtor.

## Technologies International Holdings Inc., et al., Plaintiffs,

### v.

## Commonwealth of Kentucky, et al., Defendants.

### Bankruptcy Nos. 99–50867, 99–50868, 99–50869. Adversary No. 99–5074.

United States Bankruptcy Court, E.D. Kentucky, Lexington Division.

June 11, 1999.

W. Thomas Bunch, Lexington, Kentucky, and Michael H. Reed, Philadelphia, Pennsylvania, for the debtor.

Jonathan D. Goldberg, Louisville, Kentucky, for the Commonwealth of Kentucky.

Laura Day DelCotto, Lexington, Kentucky, for intervening plaintiff Bank One.

Thomas Miller, Lexington, Kentucky, for intervening plaintiff Llama Capital Services, LLC.

## MEMORANDUM OPINION

### WILLIAM S. HOWARD, Chief Judge.

The defendants in this adversary proceeding have filed their Motion to Dismiss the plaintiffs' complaint pursuant to FRBP 7012. The plaintiffs have filed their Motion for Entry of Preliminary Injunction pursuant to FRBP 7065, FRCP 65 and 11 U.S.C. § 105. For the reasons set out herein the defendants' motion to dismiss will be sustained as to defendants Commonwealth of Kentucky and Commonwealth of Kentucky Public Protection and Regulation Cabinet and overruled as to the remaining defendants and the plaintiffs' motion for preliminary injunction will be sustained as to defendants Ronald B. McCloud, Secretary, Commonwealth of Kentucky Public Protection and Regulation Cabinet and Robert E. Nickel, Executive Director, Commonwealth of Kentucky Office of the Petroleum Storage Tank Environmental Assurance Fund.

### I

The plaintiffs, Technologies International Holdings, Inc. ("TIH"), Meridian Transport Company ("Meridian"), and Advanced Technologies International, Inc. ("ATI"), filed their Chapter 11 petitions in the District of Delaware on February 26, 1999. Venue was transferred to this district on April 5, 1999. The plaintiffs continue to operate their businesses and remain in possession of their properties as debtors-in-possession. ATI and Meridian are wholly-owned subsidiaries of TIH.

Defendant Commonwealth of Kentucky Office of the Petroleum Storage Tank Environmental Assurance Fund ("OPSTEAF") is an entity created pursuant to KRS 224.60–130(1) to establish procedures to monitor the defendant Petroleum Storage Tank Environmental Assurance Fund (the "Fund") which was established pursuant to KRS 224.60–105. All other defendants, except for the Commonwealth of Kentucky (the "Commonwealth") itself, are officers of or attorneys for agencies of the Commonwealth of Kentucky or entities involved in the administration of the Fund.

ATI was engaged in the pre-petition business of removing underground storage tanks and performing all necessary "Corrective Action Activities" to respond to releases of petroleum into the ground, typically where the owner/operator ("owner") owned only one facility and had an average annual income of less than $50,000.00 per year. ATI's Corrective Action Activities were performed in consideration of the assignment by each owner of the owner's right to receive reimbursement for eligible costs from the Fund. ATI's executory contract with the owner usually provides that ATI will be paid directly by the Fund pursuant to the assignment. Meridian is engaged in the business of transporting and disposing of environmentally contaminated material, and provides most of its services to ATI.

Prior to the filing of their Chapter 11 petitions, the plaintiffs obtained working capital from Bank One, Kentucky, N.A. (the "Bank"), including a $10,000,000.00 line of credit. As of the petition date the plaintiffs' total indebtedness to the Bank was $10,735,165.97. As collateral security for this debt, the plaintiffs granted the Bank a security interest in, *inter alia,* their accounts and the proceeds thereof, including claims for Corrective Action Activities performed by ATI that are eligible or potentially eligible for reimbursement from the Fund (collectively, the "Reimbursement Claims").

Further, ATI obtained working capital funding through several sales (collectively, the "Reimbursement Claims Sales") of Reimbursement Claims in the total aggregate face amount of approximately $33,200,-000.00 (collectively, the "Sold Reimbursement Claims") to Llama Capital Services, L.L.C. ("Llama"). The Sold Reimbursement Claims were ultimately to be "securi-

tized" by Llama, but this securitization was never consummated. ATI retained full ownership of the Reimbursement Claims which were not sold to Llama (the "Retained Reimbursement Claims"). The Bank released its security interest in the Sold Reimbursement Claims, but retained its interest in the Retained Reimbursement Claims.

As of the date of filing, a total aggregate amount of approximately $14,715,056.00 in Retained Reimbursement Claims were outstanding (or in process) and unpaid by the Fund and a total aggregate amount of approximately $29,563,681.00 in Sold Reimbursement Claims were outstanding and unpaid by the Fund. Of the total aggregate amount of approximately $49,700,000.00 in Reimbursement Claims which ATI submitted to the Fund for reimbursement for Corrective Action Activities which it performed from 1996 through the petition date, ATI (or Llama as ATI's assignee) received payment of only approximately $6,225,423.00 (including only $715,000.00 in payments during all of 1999 to the time of filing of this proceeding), and ATI (or Llama) together had received only a *de minimis* amount since the petition date to the filing of this adversary proceeding.

OPSTEAF must review applications for assistance ("Applications for Assistance") from the Fund and claims forms ("Claims Forms"). Applications for Assistance refer to filings which pursuant to 415 KAR 1:080E must be made with and approved by OPSTEAF to "obligate,", i.e., encumber, monies at the Fund for particular Corrective Action Activities which the Kentucky Natural Resources and Environmental Protection Cabinet has approved for performance at a particular site for a particular owner (collectively, "Obligated Reimbursement Claims"). Once such funds are obligated, an applicant such as ATI must thereafter complete all of the Corrective Action Activities, and file with and obtain approval by OPSTEAF of a Claim Form for that particular work in order to obtain payment from the Fund.

KRS 224.60–140(7) directly addresses the time frame for review of a claim submitted to the Fund, and expressly provides that OPSTEAF shall issue a decision on a claim within 90 days after submission, unless all parties agree in writing to an extension of time. KRS 224.60–115(3) defines "claim" as "any demand in writing for a certain sum." The regulatory provisions for the review of claims are set forth in 415 KAR 1:080. The initial version of this regulation became effective in 1993. It included a provision for an Assistance Agreement, which was to be used as a guarantee of payment to the contractor performing corrective action to the extent of the amount approved. 415 KAR 1:080 Section 1(3) (1993). As initially adopted, therefore, this regulation provided that the Application for Assistance would be reviewed in conjunction with the Claim, and that the review of an Application for Assistance would not delay review of the Claim. The regulatory requirement that a Claim not be reviewed until an Application for Assistance is approved was not inserted into the regulations until the adoption of Emergency Regulation 415 KAR 1:080E, effective July 3, 1996.

On April 12, 1999, approximately a month and a half after the plaintiffs filed their Chapter 11 petitions, an "emergency administrative regulation" (the "Emergency Regulation") was adopted by the Commonwealth. It appears to have been promulgated expressly for the purpose of allowing certain of plaintiffs' creditors to obtain payment from the Commonwealth from funds owed or to be owing to plaintiffs rather than from the bankruptcy process. It amends 415 KAR 1:080E, and is to be ultimately codified as an "ordinary administrative regulation." The Commonwealth's procedure for such "emergency regulations" allows for its adoption without public comment or hearing. The Emergency Regulation purports to permit direct payment to sub-

contractors and vendors of ATI who would otherwise be required to obtain payment from ATI pursuant to the provisions of the Bankruptcy Code in the Chapter 11 proceedings before this Court. The Emergency Regulation is unclear as to whether any reimbursement will be allowed to debtor plaintiffs in this action. Deducting the contractor type of claims which the Emergency Regulation would pay separately would, to the extent that plaintiffs did not perform the corrective actions themselves but·hired subcontractors to perform them, leave the plaintiffs with only a claim for administrative costs and profit and these do not appear to be categories for which a claim can be filed under the language of the Emergency Regulation. Under this interpretation, all of the plaintiffs' claims would be eliminated under the Emergency Regulation except those where the plaintiffs themselves "... supplied labor, material or supplies to the project, or ... performed required testing of material on the project, or ... transported or received waste from said project." There may well be other interpretations of the Emergency Regulation from the Court's initial reading of the language. However, the focus of the motions before the Court is on whether the Commonwealth may proceed to distribute funds to plaintiffs' creditors and not on whether there will be funds to distribute to plaintiffs at a later date.

Pursuant to the terms of the Emergency Regulation, an owner applies for assistance on the Application for Assistance form. If the Application for Assistance is approved, the owner submits a claim for reimbursement or payment for the costs of corrective action. OPSTEAF then issues a determination pursuant to KRS 224.60–140(7) as to whether costs submitted in the claim are eligible for payment. A claim with an approved Application for Assistance is to be reviewed within 90 days of receipt. Requests for payment may be submitted 30 days following initiation of corrective action.

When an owner has submitted a claim for payment by OPSTEAF, payment is to be made by check written to the eligible owner, or to a designated third party. However, under new Section 7(3)(a), a claim submitted by an owner or a third party designated for payment on behalf of the owner shall not be considered for payment if the owner or third party files for bankruptcy.` Further, suppliers of labor, materials, testing, transportation, or supplies to the project are to submit new payment requests on behalf of the owner. Payment of the eligible costs under this subsection shall be by check written directly to the party identified in the payment request, in this case plaintiffs' subcontractors. In other words, instead of paying the claims of the plaintiffs, the Commonwealth would pay some of plaintiffs' creditors directly and in full and nothing to other of plaintiffs' creditors including the two intervening secured lenders (the Court uses the term "secured" although a definitive determination of the status of those claims remains to be made).

The plaintiffs filed this adversary proceeding on April 22, 1999. They maintain that as a result of their ongoing inability to obtain payments from the Fund in a fair, equitable and timely manner, their businesses have been nearly destroyed, they have experienced severe financial hardship as have their employees and customers (owners), and they have been forced to file bankruptcy. They state that as of the petition date, they had essentially exhausted the cash in their pre-petition bank accounts, and that since that date their cash flow has "dried up." The plaintiffs were granted a Temporary Restraining Order ("TRO") on April 27, 1999 after a hearing. That TRO is directed to two of the Officer defendants and prevents enforcement of the Emergency Regulation pending further orders of the Court. An Agreed Order Extending Temporary Restraining Order was entered on May 6, 1999 extending the term of the TRO pending this Court's

ruling on the plaintiffs' motion for a preliminary injunction.

The parties have entered into a Stipulation of Facts which, while repetitive in part of the Court's factual findings herein, provide additional facts relevant to the proceeding:

"1. In 1990, the General Assembly of the Commonwealth of Kentucky, enacted the provisions of KRS Chapter 224.60–110 et seq., creating the Petroleum Storage Tank Environmental Assurance Fund ("the Fund"). KRS 224.60–130 states, "(T)here is created within the Public Protection and Regulation Cabinet, Office of the Secretary, The Office of Petroleum Storage - Tank Environmental Assurance Fund." Robert B. McCloud ("McCloud") is the Secretary of the Public Protection and Regulation Cabinet.

2. The legislative intent of the legislation establishing the Fund states as follows at KRS 224.60–110(3):

"That adequate financial resources will be available to provide a means for investigation and cleanup of releases from leaking underground storage tanks without delay."

3. KRS 224.60–110(11) further states that;

"It is the intent of the General Assembly that a state fund be created to assist petroleum storage tank owners or operators in complying with the federal financial responsibility requirements promulgated under federal regulations and to assist petroleum storage tank owners or operators in cleaning up contamination caused by a release."

4. As provided in KRS 224.60–140(2)(a), the Fund is to be used:

"To reimburse petroleum storage tank owners and operators for the costs, expenses, and other obligations incurred for corrective action as the result of a release into the environment from a petroleum storage tank. Reimbursement shall be limited to only those costs, expenses and other obligations incurred to comply with corrective action requirements established by the cabinet ..."

5. The Fund is administered by the Office of the Petroleum Storage Tank Environmental Assurance Fund ("OPSTEAF" of "Office"). Robert E. Nickel ("Nickel") is the Executive Director of OPSTEAF. By authority of KRS 224.60–130, the OPSTEAF is delegated the authority to (a) "(E)stablish by administrative regulation the policy, guidelines and procedures to administer the petroleum storage tank environmental assurance fund" ... "the range of amounts to be paid from the fund ..." (b) "... the criteria to be met to be eligible to participate in the fund and receive reimbursement from the fund" These regulations are found in Title 415 of the Kentucky Administrative Regulations ("KAR").

6. KRS 224.60–140(5) states in part that "(T)he Fund shall be used to guarantee payment of reasonable costs and expenses to a contractor performing corrective action under contract to a petroleum storage tank owner or operator ..." 415 KAR 1:080 Section 8 *Eligible Costs,* (July 1998), states that: "The Fund's reimbursement for costs of corrective action shall be limited to reasonable and necessary costs, expenses and other obligations incurred for corrective action ..." 415 KAR 1:080 Section 4(3) Certification and 415 KAR 1:080 Section 5(2)(b) *Criteria for Approval of a Claim,* contain additional provisions regarding payments for corrective action.

7. TIH and Meridian were incorporated in 1997. ATI was incorporated in 1991. ATI and Meridian are wholly-owned subsidiaries of TIH, which is a holding company. TIH has other interests that are not involved in this Bankruptcy.

8. Prior to the Petition Date, ATI was engaged in the business of removing underground storage tanks and performing all necessary Corrective Action Activities to respond to releases of pe-

troleum. ATI's Corrective Action Activities were performed in consideration of the assignment by each owner/operator of the owner/operator's right to receive reimbursement for eligible costs from the Fund. All checks from the Fund are made payable to the owner/operator.

9. Meridian is engaged in the business of arranging for the transportation and disposition of environmentally contaminated material. Meridian provides most of its services to ATI.

10. From 1992 through 1997, ATI performed work as a subcontractor to certain prime contractors on regional projects funded by the Environmental Protection Agency. In 1996, ATI began to focus its business and marketing on private owner/operators of currently or previously operating retail petroleum distribution facilities (gasoline stations or bulk storage facilities). ATI eventually narrowed its marketing efforts to soliciting business from site owner/operators who might be qualified for reimbursement of Corrective Action Activities from the Office of the Petroleum Storage Tank Environmental Assurance Fund.

11. ATI provided complete turnkey assistance to site owner/operators as well as project funding which permitted the site owner/operator to pay for services only after the Fund had paid the owner/operator. Under its agreements with the owner/operators, ATI obtained limited powers of attorney and assignments of the owner/operator's reimbursement rights in consideration of the performance of the Corrective Action Activities on their behalf.

12. KRS 224.60–14(2) provides in part that the Fund may "... reimburse ... owners or operators for the costs, expenses, and other obligations incurred for corrective action as the result of a release". 415 KAR 1:080(2) states that "Application shall be made on the Application for Assistance form". The "approved Application for Assistance may be used, as a guarantee of payment by the owner or operator to a contractor performing corrective action to the extent of the amount obligated and approved by the Secretary" 415 KAR 1:080(3)(a)(2)(c) (July, 1998).

13. 415 KAR 1:080 Section 2(7) (July 1998) states;

The claim may be submitted with the application for assistance but shall not be considered received for review until the application has been approved by the Secretary or Secretary's designee."

14. Prior to the filing of the bankruptcy case, disputes had arisen during the processing of the claims submitted by ATI on behalf of owner/operators between the Office and ATI.

15. The Office submitted revisions to its regulations to the Legislative Research Commission in January and February 1999 for implementation. Those revisions were reviewed through public comment and hearing, but have not yet been implemented. Twelve of the thirteen regulations of the Fund were revised at that time. All of the chapters of 415 KAR except 1:125 were submitted for revision.

16. On April 12, 1999, Governor Paul E. Patton issued a Statement of Emergency authorizing and implementing 415 KAR 1:080E. At that time, the previously submitted revisions to 415 KAR 1:080 were withdrawn from the regulatory revision process. Only Section 7.3A of the emergency regulation differed substantively from the revisions to the regulation issued in January 1999.

17. This Statement of Emergency identified the purpose of the emergency administrative regulation, which was to protect owner/operators who were or may be subject to liens and litigation from vendors and subcontractors who performed corrective action services. The regulation changed the payment procedure to permit vendors and subcontractors to be paid directly from the Fund, a process not permitted by the

previous regulation. A copy of the Statement of Emergency and 415 KAR 1:080E is attached as Exhibit "A".

18. Section 7.3A requires that:

"Any claim which has been submitted by an owner/operator or by a third party designated for payment on behalf of an owner/operator, shall not be considered for payment if the owner/operator or third party, at any time prior to the payment of the claim, has been named as a debtor in any voluntary or involuntary proceeding under Title 11. To be eligible for reimbursement, each person who supplied labor, material or supplies to the project, or who performed required testing of material on the project, or who transported or received waste from said project, shall submit a new payment request on behalf of the owner/operator."

19. Prior to the Petition Date, the Debtors obtained working capital through loan facilities from the Intervenor, Bank One, Kentucky, N.A. ("Bank"). As collateral security for the Bank Debt, prior to the Petition Date, the Debtors granted to the Bank a security interest in, *inter alia,* all of the Debtors' accounts, chattel paper, instruments, contract rights, general intangibles and other collateral as described in the Intervening Complaint of the Bank, and the proceeds thereof, including claims for Corrective Action Activities performed by ATI that are eligible or potentially eligible for reimbursement from the Fund (collectively, "Reimbursement Claims").

20. Additionally, during 1998, ATI obtained working capital funding through several sales (collectively, the "Reimbursement Claims Sales") to TSPE, who sold them in turn, to the Intervenor, Llama Capital Services, L.L.C. ("Llama").

21. ATI initially contributed the Reimbursement Claims to Technologies S.P.E., L.L.C. ("TSPE"), in exchange for 99.99% of the equity of TSPE and cash, and TSPE then sold the Reimbursement Claims to Llama pursuant to various UST Reimbursement Claim Purchase and Sale Agreements, and other documents, by and among TSPE, as seller, Llama, as buyer, and ATI, as contractor.

22. Llama paid cash consideration to TSPE in those Reimbursement Claims Sales (the "Cash Consideration"). TSPE, in turn, transferred all or substantially all of the Cash Consideration to ATI. TSPE, also received and retained a "residual interest" in each of the Sold Reimbursement Claims (the indirect residual interests in the Sold Reimbursement Claims held by TSPE which would benefit ATI, as TSPE's 99.99% owner, are hereinafter collectively referred to as the "Residual Interests").

23. The Sold Reimbursement Claims were ultimately to be "securitized" by Llama (the "Securitization"). However, the Securitization was never consummated. In connection with the five Reimbursement Claims Sales and the proposed Securitization, officers and employees of OPSTEAF met and conferred by teleconference during 1998 with representatives of Llama, the Bank and Fitch IBCA, Inc., the rating agency which was to rate the securities to be issued in the Securitization (the "Rating Agency").

24. ATI retained full ownership of all of the Reimbursement Claims, which were not sold to Llama (the "Retained Reimbursement Claims"). The Bank released its security interest in the Sold Reimbursement Claims, but retained its security interest in the Retained Reimbursement Claims.

25. As of the Petition Date, Retained Reimbursement Claims totaled in the aggregate approximately $15,000,000.00, and approximately $32,000,000.00 were included in the Sold Reimbursement Claims submitted to the Office. The amounts stated are claimed amounts and do not necessarily represent the amount

to be determined by the Office to be payable.

26. KRS 224.60–140(5) states that:

"The fund shall be used to guarantee payment of reasonable costs and expenses to a contractor performing corrective action under contract with a petroleum storage tank owner or operator subject to entry level amounts payable by the petroleum storage tank owner or operator. Money in the fund shall be obligated to secure the guarantee."

27. The Commonwealth of Kentucky has filed no Proof of Claim in this bankruptcy proceeding against ATI, Meridian or TIH.

28. Although there were many claims against the Fund that had not and have not been processed, there nevertheless remained large amounts of moneys for the Obligated Retained Reimbursement Claims and the Sold Reimbursement Claims remaining unpaid as of the Petition Date."

## II

The plaintiffs maintain that the enactment of the Emergency Regulation retroactively deprives them of their property, impairs contracts between them and their subcontractors, vendors and customers, and destroys their businesses and bankruptcy estates. In this regard, they allege that the Emergency Regulation will deprive them of property without just compensation, and will deprive them of due process and equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution under color of state law.

They allege that in contravention of Kentucky constitutional, statutory and common law, the Emergency Regulation will deprive them of various administrative and judicial rights of reconsideration, review or appeal which they were actively pursuing on the petition date or which are rights comprising property of their estates under 11 U.S.C. § 541 which they have a right to pursue. These rights of reconsideration, review and appeal involve millions of dollars of Reimbursement Claims.

They further allege that the Emergency Regulation violates the Bankruptcy Code by, *inter alia*, unlawfully destroying or impairing property of their estates under § 541, their rights to use, sell or lease property of the estates under § 363, and their rights to perform, assume, assign or reject executory contracts between themselves and their subcontractors, vendors and customers under § 365. They further allege that the Emergency Regulation violates the automatic stay of § 362 by, *inter alia*, enabling their creditors to collect on prepetition claims through the direct or indirect transfer of property of their estates, and by obtaining or exercising control over the property of their estates without obtaining relief from the stay; that it unlawfully discriminates against them by reason of their being debtors under the Code in violation of § 525(a); and that it unlawfully effectuates unauthorized postpetition transfers of property of their estates in violation of § 549.

## III

The Motion to Dismiss casts a wide net but appears to fall into four categories:

A. That all of the defendants enjoy sovereign immunity by virtue of the Eleventh Amendment to the United States Constitution;

B. That the Fund in particular is an agency of the Commonwealth and therefore enjoys sovereign immunity;

C. That the plaintiffs have not met the requirements of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), for injunctive relief against further violations of plaintiffs' rights by the defendant officers of the Commonwealth; and

D. That Counts six, seven and nine cite violations of state constitutional rights or state law and *Ex Parte Young* cannot be used to obtain injunctive relief for such violations.

## IV

■ This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334 and the automatic order of reference of bankruptcy proceedings to the judges of the Bankruptcy Court entered by the District Court of this district. Pursuant to subsection (e) of § 1334, this Court has exclusive jurisdiction of the property of the debtors and of their estates. While the complaint states both core and non-core claims for relief, actions for injunctive relief pursuant to 11 U.S.C. § 105 and actions to address violations of the automatic stay pursuant to 11 U.S.C. § 362 are core proceedings. 28 U.S.C. § 157(b).

■ In considering a motion to dismiss pursuant to FRBP 7012 and FRCP 12, the Court may assume the truth of all facts alleged in the complaint. In *Columbia Natural Resources v. Tatum,* 58 F.3d 1101 (6th Cir.1995), the court, in determining whether a district court had correctly dismissed a suit pursuant to FRCP 12(b)(6), stated:

> The district court must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief..... When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor..... Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations. (Cites omitted.)

*Id.* at page 1109. See also *Nelson v. Miller,* 170 F.3d 641 (6th Cir.1999).

## V

### A. Sovereign Immunity

The Eleventh Amendment to the United States Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

■ By the very language of the Eleventh Amendment, the immunity enjoyed by the states is not "immunity" at all but a limitation on the jurisdiction of the federal courts. Patricia L. Barsalou and Scott A. Stengel, *Ex Parte Young: Relativity in Practice,* 72 Am.Bankr.L.J. 455 (1998) at page 460. See also Kenneth N. Klee, James O. Johnston and Eric Winston, *Dealing with the Government: Sovereign Immunity, Eleventh Amendment, and Bureaucratic Impunity,* SD24 ALI–ABA 159 (1998). The language, taken literally, also would limit its application to lawsuits against a state by persons of another state or country. However, the scope of the Amendment has long been broadened to include lawsuits against a state by citizens of that same state by incorporating into the Amendment the concept of common law sovereign immunity. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

A plurality decision in 1989, *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), held that Congress could abrogate sovereign immunity with respect to Article I under the Commerce Clause powers. However, this newly clarified authority of the federal government was to be short lived. In 1996, in readdressing the matter, the Supreme Court held that when Congress chooses to abrogate the immunity enjoyed by the states pursuant to the Eleventh Amendment, it must do so explicitly and pursuant to a valid exercise of power. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). It identified only the Fourteenth Amendment as authorizing such an abrogation and held that the Indian Gaming Regulatory Act was not enacted pursuant to that Amendment. See also *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614

(1976) (Congress may validly abrogate the states' eleventh immunity pursuant to the Fourteenth Amendment); *Timmer v. Michigan Department of Commerce*, 104 F.3d 833 (6th Cir.1997) (Congress may abrogate states' Eleventh Amendment immunity pursuant to the Fourteenth Amendment and the that Amendment need not be specifically cited by Congress as its authority in the enactment); *Franks v. The Kentucky School for the Deaf*, 142 F.3d 360 (6th Cir.1998) (same). In *Seminole*, the Court said:

> Petitioner argues that Congress through the Act abrogated the States' immunity from suit. In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity," ...; and second, whether Congress has acted "pursuant to a valid exercise of power." (Citations omitted)

At page 55, 116 S.Ct. 1114. After finding Congress had clearly expressed its intent to abrogate sovereign immunity in the Indian Gaming Regulatory Act, the Court stated, at page 59, 116 S.Ct. 1114:

> Thus our inquiry into whether Congress has the power to abrogate unilaterally the States' immunity from suit is narrowly focused on one question: Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate? .... Previously, in conducting the inquiry, we have found authority to abrogate under only two provisions of the Constitution. In Fitzpatrick, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution..... We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that "The Congress shall have the power to

enforce, by appropriate legislation, the provisions of this article." .... We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to Abrogate the immunity from suit guaranteed by that Amendment.

The Court then concluded that *stare decisis* did not prevent it from reaching a different conclusion from its recent case and overruled the plurality decision in *Union Gas*, holding that the Commerce Clause did not authorize Congress to abrogate the states' sovereign immunity.

The Court further addressed the application of the doctrine of *Ex Parte Young* to the matter at hand:

> Here, of course, we have found that Congress does not have the authority under the Constitution to make the state suable in federal court under § 2710(d)(7). Nevertheless, the fact that Congress chose to impose upon the State a liability which is significantly more limited than would be the liability imposed upon the state officer under Ex parte Young strongly indicates that Congress had no wish to create the latter under § 2710(d)(3). Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted had it known § 2710(d)(7) was beyond its authority. If that effort is to be made, it should be made by Congress, and not by the federal courts. We hold that Ex parte Young is inapplicable to the petitioner's suit against the Governor of Florida, and therefore that suit is barred by the Eleventh Amendment and must be dismissed for a lack of jurisdiction.

At page 75, 116 S.Ct. 1114.

The application of the principles enunciated in *Seminole* to matters in bankruptcy has, naturally, been the subject of much debate since many debtors have obligations to or claims against state govern-

ments and agencies. Several courts have found that the Bankruptcy Code was enacted pursuant to appropriate provisions of the Fourteenth Amendment and thus state governments and agencies do not enjoy sovereign immunity in bankruptcy court since Congress clearly abrogated sovereign immunity for selected sections of the Bankruptcy Code in § 106. *In re Headrick,* 203 B.R. 805 (Bankr.S.D.Ga.1996); *In re Willis,* 230 B.R. 619 (Bankr.E.D.Okla.1999); *In re Straight,* 209 B.R. 540 (D.Wyo.1997). However, it appears that a majority of courts which have considered the matter, including this one, have found that the Bankruptcy Code was not enacted pursuant to the Fourteenth Amendment and have concluded that the reasoning of *Seminole* is equally applicable to bankruptcy, Congress' clear abrogation of sovereign immunity in § 106 of the Bankruptcy Code notwithstanding. *Tri–City Turf Club v. Kentucky Racing Commission (In re Tri–City Turf Club),* 203 B.R. 617 (Bankr.E.D.Ky.1996); *In re Justice,* 224 B.R. 631 (Bankr.S.D.Ohio 1998); *Matter of Estate of Fernandez,* 123 F.3d 241 (5th Cir.1997); *In re C.J. Rogers, Inc.,* 212 B.R. 265 (E.D.Mich.1997); *In re Sacred Heart Hospital of Norristown,* 133 F.3d 237 (3rd Cir.1998); *In re Mitchell,* 222 B.R. 877 (9th Cir. BAP 1998); *In re Charter Oak Associates,* 203 B.R. 17 (Bankr.D.Conn.1996); *In re Elias,* 218 B.R. 80 (9th Cir. BAP 1998); *In re Lush Lawns, Inc.,* 203 B.R. 418 (Bankr.N.D.Ohio 1996). While the 6th Circuit has not ruled directly on the effect of *Seminole Tribe* on bankruptcy matters, in a similar circumstance, it has addressed the effect of the Commerce Clause and its failure to provide authority for a waiver of sovereign immunity for the Fair Labor Standards Act. *Wilson–Jones v. Caviness,* 99 F.3d 203 (6th Cir.1996).

■ The plaintiffs contend that the Commonwealth has waived its sovereign immunity although it has not filed a claim in the bankruptcy case. *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *In re Barrett Refining Corp.,* 221 B.R. 795 (Bankr.W.D.Okla.1998). The plaintiffs contend that the filing of a motion to dismiss is the functional equivalent of filing a claim. It is clear that the application of *Katchen* and *Barrett* requires the filing of a claim as the basis for a waiver of sovereign immunity. The Court does not agree with the plaintiffs that the motion to dismiss is the functional equivalent of filing a claim and finds no waiver of sovereign immunity by the Commonwealth.

The holding of *Seminole* requires the dismissal of this action as to the defendants Commonwealth of Kentucky and Commonwealth of Kentucky Public Protection and Regulation Cabinet. The only remaining avenue of relief available from the effect of the Emergency Regulation, injunctive relief against the Officers forbidding prospective violations, relies on *Young,* discussed below.

### B. The Fund and OPSTEAF Are Agencies of the Commonwealth and Therefore Immune

While it is clear that certain of the defendants are agencies of the state, an argument is made that OPSTEAF and the Fund are not. Citing *Kish v. Verniero (In re Kish),* 221 B.R. 118 (Bankr.D.N.J.1998), the plaintiffs contend that there is doubt as to whether OPSTEAF and the Fund are "arms of the state" and contend an evidentiary hearing is needed.

■ OPSTEAF is the administrative arm of the Petroleum Storage Tank Environmental Assurance Commission created by KRS 224.60–125, et seq. It is attached to the Natural Resources and Environmental Protection Cabinet for administrative purposes. The Fund was created by KRS 224.60–140 and in KRS 224.60–110 "Legislative findings and intent" is referred to as a "state fund." The Fund is to be maintained as a "separate and distinct interest-bearing account" and shall contain money appropriated by the General Assembly, interest, penalties collected and other money collected by virtue of the

enactment (presumably fees). KRS 224.60–140 enumerates several purposes for which the money in the Fund may be used. These include payment of administrative expenses, payment to owners for corrective actions, reimbursement to third-parties for bodily injury and property damage as a result of a release of petroleum into the environment. The use of the fund for corrective action and compensation third-parties for bodily injury and property damage is limited to $1,000,000 per occurrence. Plaintiffs' claims filed with the Fund for corrective actions would seem to be limited to recovery from this fund of money as opposed to the general treasury of the Commonwealth. In considering whether any recovery would be. from the state treasury, the Supreme Court has stated:

> When deciding whether a state instrumentality may invoke the State's immunity, our cases have inquired into the relationship between the State and the entity in question. In making this inquiry, we have sometimes examined "the essential nature and effect of the proceeding," ..., and sometimes focused on the "nature of the entity created by state law" to determine whether it should "be treated as an arm of the State," ... (citations omitted)

\* \* \*

Of course, the question whether a money judgment against a state instrumentality or official would be enforceable against the state is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued.

*Regents of the University of California v. Doe,* 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), beginning at page 429, 117 S.Ct. 900. The present motion to dismiss is made at the initiation of the case, prior to answer and discovery, and the movant has the burden to demonstrate to the Court that no set of facts which the plaintiffs could offer in support of their complaint would be sufficient to entitle the plaintiffs to relief as against these defendants. With no evidence before the Court, it cannot summarily conclude that the plaintiffs could not prevail as against OP-STEAF and the Fund and therefore the motion should be overruled as to these two defendants.

### C. Ex Parte Young

Defendants motion to dismiss pursuant to *Ex Parte Young* points out that decisions of the Supreme Court have limited the use of the *Young* doctrine. In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court clarified that only prospective injunctive relief may be awarded under *Young.* In *Seminole,* the Court denied relief under *Young* where Congress had devised an elaborate remedial scheme which suggested no equitable remedy fashioned by the courts was appropriate. Most recently, the Court, in *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), found that where special sovereignty interests of the state were involved, the *Young* fiction should not be employed to invoke federal jurisdiction. Recently the 6th Circuit has had an opportunity to apply the *Coeur d'Alene* rationale in *MacDonald v. Village of Northport, Michigan,* 164 F.3d 964 (6th Cir.1999). That case, like *Coeur d'Alene,* involved ownership of land by units of government. As the concurring Justices found in *Coeur d'Alene,* it was essentially a quiet title action.

Despite the gloom and doom forecast for *Young* relief in the Commonwealth's brief, it appears that the *Young* is alive and well in the Sixth Circuit. In *Nelson v. Miller,* supra, a 1999 decision, at page 646, the Court says:

> Appellants have not brought suit against the State of Michigan. Rather, they have sued only the Secretary of State in her official capacity as the state officer charged with enforcing Michigan's election laws. Thus, the question arises as to whether the Secretary of

State can be cloaked with the State of Michigan's Eleventh Amendment sovereign immunity in this instance. "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" .... While it is clear to us that it is Mich.Comp.Laws Ann. § 168.751, and not the Secretary of State's enforcement of that statute, that is the heart of this litigation, and thus it is the State of Michigan, and not the Secretary of State, who is the real party in interest, we feel constrained to deny Appellee's Eleventh Amendment challenge on the Basis of Ex parte Young, ..., and its progeny, even though, as one able commentator has put it, "[o]ne does not go to the trouble of amending the Constitution in order to alter the caption on the complaint." ....

"Whether a suit against State officials in their official capacity is deemed to be against the State depends on whether the plaintiff seeks 'retroactive' or 'prospective' relief." .... When the relief sought is "retroactive," it usually takes the form of money damages, and thereby significantly implicates the government entity itself. In such an instance the "official capacity claim ... is deemed to be against the State whose officers are the nominal defendants, [and] the claim is barred by the Eleventh Amendment." .... On the other hand, when the relief sought is prospective injunctive relief that would "merely compel[ ] the state officer['s] compliance with federal law in the future," ..., then such a request "is ordinarily sufficient to invoke the Young fiction." .... (Citations omitted).

The genesis of *Young* was *Osborn v. Bank of the United States*, 22 U.S. 738, 6 L.Ed. 204, 9 Wheat. 738 (1824) and *Young's* immediate predecessor was *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). The underlying authority of the federal courts in *Young* is the Fourteenth Amendment guarantee of economic substantive due process to "persons," which includes corporations. See Barsalou and Stengel, supra, at page 480. In *Smyth* the Court held that when the Nebraska legislature set the rates for railroads so low that they could not make a profit, the railroads were denied economic substantive due process. The Emergency Regulation before the Court in this case can well be read to deny the plaintiffs any profit, as discussed above. Whether the Commonwealth intended this result is not the present question.

■ Applying the strictures placed on *Young* above, first it is clear that among the relief sought, and indeed the principal relief sought, is injunctive relief against future application of the Emergency Regulation. Since the Court has found that the Commonwealth and the "arms of the state" must be dismissed in this action, no claims for relief will remain seeking relief against any *state* entity. If OPSTEAF and the Fund are ultimately found to be "arms of the state," they too will be dismissed as defendants. Secondly, no remedial scheme has been identified which would indicate Congress has a separate plan to provide relief to these plaintiffs. Additionally, as is set out below, all claims based on state constitutional and statutory provisions will be dismissed thus satisfying the another prong of *Young*. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

■ The facts of this case bear no resemblance to those of *Coeur d'Alene*. The thrust of this action is to stop the Commonwealth from disregarding the Constitution and the Bankruptcy Code and proceeding with its own distribution scheme (applying solely to debtors in bankruptcy cases) by distributing funds claimed owed to the debtor/plaintiffs to creditors the Commonwealth chooses many of whom may be unsecured creditors of the plaintiffs. This action by the Commonwealth would completely disregard the secured creditors who claim a perfected security

interest in those funds. The Commonwealth's action would further disregard the priorities Congress has established including administrative expenses, priority wage claims and priority pension claims to name only a few. It is hard to imagine a more egregious affront to the exclusive federal authority over bankruptcy than this attempted usurpation of authority ceded to the federal government at the Constitutional Convention. As *Pennhurst* discusses, the theory and use of *Young* is to vindicate the supreme authority of federal law. *Pennhurst*, beginning on page 104:

> As discussed above, the injunction in Young was justified, notwithstanding the obvious impact on the State itself, on the view that sovereign immunity does not apply because an official who acts unconstitutionally is "stripped of his official or representative character," .... This rationale, of course, created the "well-recognized irony" that an official's unconstitutional conduct constitutes state action under the Fourteenth Amendment but not the Eleventh Amendment.... Nonetheless, the Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to "the supreme authority of the United States." ... As Justice Brennan has observed, "Ex Parte Young was the culmination of efforts by this Court to harmonize the principles of the Eleventh Amendment with the effective supremacy of rights and powers secured elsewhere in the Constitution." ... Our decisions repeatedly have emphasized that the Young doctrine rests on the need to promote the vindication of federal rights.... (Citations omitted)

The result of this action, if the *plaintiffs* prevail, is that the Commonwealth will decide the validity of the claims submitted by the plaintiffs within the system it has created and remit funds due the plaintiffs to the plaintiffs as debtors in possession. Disputes concerning the validity of those claims will be determined by the mechanism which the Commonwealth has established for such claims, not by the federal courts. The federal courts will decide matters arising in, under or related to the bankruptcy proceedings but not monetary claims by the plaintiffs against the Commonwealth.

### D. State Constitutional and Statutory Violations

Counts six and seven allege violations by the defendants of certain state statutes involving the promulgation of the Emergency Regulation and statutory construction. Count nine recites, *inter alia,* a claim based on Section Two of the Kentucky Constitution. Defendants cite *Pennhurst* for authority that where federal and state claims are mixed and pendent jurisdiction would normally obtain, the Eleventh Amendment entitles the state to immunity even if *Young* applies as to the federal claims. In addressing this question, the *Pennhurst* Court said, at page 121,

> In sum, contrary to the view implicit in decisions such as Greene, supra, neither pendent nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment. We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.... We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction. (Citation omitted)

 Plaintiffs counter with the contention that, even if the Commonwealth cannot be sued for retrospective relief, clear precedent provides that the state can be liable for attorney's fees. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Missouri v. Jenkins by Agyei,* 491 U.S. 274, 109 S.Ct. 2463, 105

L.Ed.2d 229 (1989). These cases appear to allow an award of attorney's fees against the state for certain actions for prospective relief. An interesting anomaly of the *Hutto* case is that the state was not even a party to the case but an award of attorney's fees was allowed against it nonetheless. The Court reasoned that an award of attorney's fees against the officer defendants would be paid by the state and found no offense to the Eleventh Amendment. However, in view of the unequivocal language of *Pennhurst*, the Court concludes that the state law claims of the complaint must be dismissed.

## VI

■■■■ The plaintiffs have requested that a preliminary injunction issue in this matter enjoining the Officers from implementing and enforcing the Emergency Rule. In addition to the provisions of Federal Rule of Bankruptcy Procedure 7065, which substantially adopts Federal Rule of Civil Procedure 65, the plaintiffs cite § 105 of the Bankruptcy Code as authority for such relief. Section 105's broad language, ". . . . issue any order, process, or judgment that is necessary to carry out the provisions of this title . . ." includes the power to issue injunctive relief. *In re Eagle–Picher Industries, Inc.*, 963 F.2d 855 (6th Cir.1992). The court must take into consideration the traditional factors for injunctive relief. *Eagle–Picher* at page 858. Those factors are a strong or substantial likelihood or probability of success on the merits, irreparable injury to the movant, the lack of substantial harm to the other party and whether the public interest would be served by the issuance of the injunction. *Eagle–Picher*, supra; *Unsecured Creditors Committee v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223 (6th Cir.1985); *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir.1991).

■■■ The plaintiff's complaint cites numerous violations of the Bankruptcy Code including § 362(a) (the automatic stay), § 525(a) (government discrimination against debtor in bankruptcy proceeding), § 541 (property of the estate includes all legal and equitable interests), and § 549 (avoidance of transfers of property of the estate which occur postpetition) among others. The plaintiffs also allege that the actions of the defendants violate the Contracts Clause and the Supremacy Clause of the Constitution.

The actions complained of, even on a cursory review, do appear to contravene many of the provisions of the Bankruptcy Code and provisions of the United States Constitution which provide for the supremacy of the federal government on those areas ceded to it by the states in the Constitution. The debtor appears to have a property interest in the funds committed to approved projects for which work has been completed (and possibly other funds as well) and the use of these funds to pay debtors' subcontractors clearly is an exercise of control over the interest of the debtors' estates in these funds which appears to violate the automatic stay. The blatant discrimination against the debtors in bankruptcy proceedings in the language of the Emergency Regulation appears to violate § 525(a). The distribution scheme which the Emergency Regulation proposes appears to contravene the distribution scheme which Congress has passed and set forth in § 507 and related sections. To the extent that the Emergency Regulation provides for the distribution of funds owed to a debtor to the debtor's creditors rather than to the debtor, it appears to be a state enactment in an area in which federal authority is supreme since the Constitution provides in Article 1, Section 8 that Congress shall have the power "To establish . . . uniform Laws on the subject of Bankruptcies. . . ." These are only a few obvious examples of violations of federal law and Constitutional provisions and there may well be merit to many of the other violations which the plaintiffs allege. Clearly there is a substantial likelihood of success on the merits on the part of the plaintiffs.

The irreparable harm to the movant in this matter is self evident. The distribution of funds due the debtors to their creditors outside the bankruptcy context completely frustrates the purpose of filing the Chapter 11 reorganization proceedings. Likewise, no harm is done to the Officer defendants in enjoining them pending final resolution of this adversary proceeding. The public interest is clearly served by the issuance of a preliminary injunction which prevents action by the state which appears to violate federal law.

Separate orders will be issued on the Motion to Dismiss and the Motion for a Preliminary Injunction.